*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD and O'HERN—3.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUBIN CARTER AND JOHN ARTIS, DEFENDANTS-APPELLANTS.

Argued March 9, 1982—Decided August 17, 1982.

*Leon Friedman* and *Myron Beldock,* members of the New York bar, argued the cause for appellant Rubin Carter (*Busch & Busch* and *Perkins & Cassidy,* attorneys; *Leon Friedman, Myron Beldock, Thomas I. Atkins, Charles E. Carter* and *James I. Meyerson,* members of the New York bar, of counsel).

*Lewis M. Steel,* a member of the New York bar, argued the cause for appellant John Artis (*Louis S. Raveson, Jeffrey E. Fogel* and *Perkins & Cassidy,* attorneys; *Lewis M. Steel, Leon Friedman, Thomas I. Atkins, Charles E. Carter* and *James I. Meyerson,* members of the New York bar, of counsel).

*John P. Goceljak,* First Assistant Prosecutor, and *Ronald G. Marmo,* Chief Assistant Prosecutor, argued the cause for respondent (*Joseph A. Falcone,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

SCHREIBER, J.

This is another episode arising out of the murder convictions of Rubin Carter and John Artis. The matter first came before us in 1969 following their convictions for the murders of a bartender and two patrons in the Lafayette Bar and Grill in the City of Paterson. Three life sentences were imposed on each defendant. Two consecutive life sentences were imposed upon Carter, with the third to be concurrent with the second life term. As to Artis, the three life terms were concurrent. We affirmed the convictions. 54 *N.J.* 436 (1969). The United States Supreme Court denied their petitions for *certiorari.* 397 *U.S.* 948, 90 *S.Ct.* 969, 25 *L.Ed.*2d 130 (1970).

The defendants sought a new trial, asserting that the State's key identification witnesses had recanted their trial testimony, that the prosecutors had knowingly permitted these witnesses to testify falsely, and that the State had failed to disclose material evidence that would have tended to exculpate the defendants. Two separate motions for a new trial were denied by the trial court, *State v. Carter*, 136 *N.J.Super.* 271 (Cty.Ct.1974), and *State v. Carter*, 136 *N.J.Super.* 596 (Cty.Ct.1975). Defendants appealed and we certified the matter on our own motion. We vacated the judgment because the State had not disclosed to the defendants a tape recording of an interview of an eyewitness, Alfred Bello, containing information material and favorable to the defendants' cause that "clearly possessed the capacity to have affected the jury's evaluation of the credibility of Bello's . . . identification testimony." 69 *N.J.* 420, 434 (1976).

The retrial commenced on October 12, 1976 and concluded on December 21, 1976 when the jury again returned verdicts of guilty of murder in the first degree. The Appellate Division affirmed in an extensive unreported opinion. We granted the defendants' petitions for certification, 84 *N.J.* 384 (1980). After oral argument, we remanded the cause to the trial court to hold hearings and make factual findings to determine whether the rule in *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), had been violated and whether the violation warranted vacation of the judgments of conviction. Further, if the trial court found no *Brady* violation, it was to determine whether a new trial should be granted based on newly discovered evidence. *State v. Carter*, 85 *N.J.* 300 (1981). We retained jurisdiction. We intimated no view on the ultimate merits of these issues or of defendants' numerous other claims of error.

The trial court held extensive hearings and submitted detailed findings. It found that there was no *Brady* violation, and that a new trial was not warranted on the basis of newly discovered evidence. We held further oral argument and now affirm.

# I

## Weight of the Evidence

Both defendants argue that the jury verdicts were contrary to the weight of the evidence and that the trial court erred in not granting their motions for a new trial. Our obligation in this respect is to determine whether "it clearly and convincingly appears that there was a manifest denial of justice under the law." *See State v. Sims*, 65 *N.J.* 359, 373–74 (1974); *R.* 2:10–1. Indeed, in reviewing a trial court's action on a motion for a new trial following a jury verdict, the appellate court must weigh heavily the trial court's "views of credibility of witnesses, their demeanor, and [its] general 'feel of the case.'" *Id.* at 373. The evidence should be sifted to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present. *See Jackson v. Concord Co.*, 54 *N.J.* 113 (1969). Tested by these standards, the verdict is sustainable.

A brief summary of the evidence introduced in the second trial is in order. The tragedy occurred at the Lafayette Bar and Grill on June 17, 1966. William Marins was seated at the bar with his friend, Fred Nauyaks. Hazel Tanis was also there and the bartender, James Oliver, was behind the bar. At about 2:30 a. m., two armed black men entered and began shooting. Oliver and Nauyaks were killed immediately. Tanis suffered multiple gunshot wounds and died four weeks later. Marins was shot in the temple.

Patricia Valentine lived above the tavern. Awakened by gunshots at about 2:30 a. m., she ran to the window and saw two black men run to an automobile and drive away. The car was white and had taillights shaped like triangles, wider at the outside and tapering toward the center. The rear lights did not extend across the whole back of the car. It had out-of-state license plates with yellow or gold numbers on a dark blue background. Mrs. Valentine saw the car leave the corner of Lafayette and East 18th Streets, where the tavern was located,

and head west on Lafayette Street toward East 16th Street. She threw a raincoat over her pajamas and ran downstairs to the bar where she met Bello at the front door. He cautioned her not to go inside, but she did. She observed the scene and returned to her apartment and called the police. Mrs. Valentine dressed and went back downstairs. She gave Police Officer Alexander Greenough a description of the car. Shortly before 3:00 a. m., two police cars escorted a white car to the Lafayette Bar and Grill. Carter and Artis were in that car. It was a new white 1966 Dodge Polara with New York State license plates having yellow numbers on a dark blue background. Carter, who had leased the car, had not loaned it to anyone else that night. Mrs. Valentine identified this vehicle as the same one she had seen twenty minutes earlier.

Bello testified that Arthur Bradley and he were in the process of breaking into the Ace Metal Company offices located near the Lafayette Bar and Grill. Bello, who was acting as a lookout, walked down Lafayette Street toward the tavern to purchase some cigarettes. He testified at the trial that he heard some shots and saw two black males come around the corner, one carrying a shotgun and the other a pistol. Bello ran into a nearby alleyway. When he heard the screeching of a car, he came out and saw a white vehicle drive away. He noticed that the rear lights were triangular in shape and that the car had New York or Pennsylvania license plates. Bello went into the bar, took some money from the cash register and telephoned the police.

Bello told Officer Greenough of the white car with the blue and yellow license plates and the two black males. When Carter and Artis were brought to the bar in the 1966 Dodge automobile, Bello identified it as the same vehicle he had previously seen. Bello did not tell the police that Carter and Artis were the same individuals he had previously seen with the weapons. A month later, Bello met Paterson Police Officer Donald LaConte and explained why Bradley and he had been in the vicinity. In October, Bello told LaConte that Carter and Artis were the two

armed men at the scene. He identified them to the police in an interview on October 11 and in a formal statement signed on October 14, 1966. He testified to the same effect in the 1967 trial.

Subsequently, while in jail in 1974, Bello signed a statement at the behest of Fred Hogan of the Monmouth County Public Defender's Office in which he recanted his 1967 trial testimony. In that statement he said that he could not positively identify Carter and Artis. On October 30, 1975, Bello met with Assemblyman Eldridge Hawkins who, at Governor Byrne's request, was investigating the case. His affidavit obtained by Hawkins stated he was in the bar when the shooting occurred. He did not recall seeing Carter and Artis in the bar, but did remember seeing them when he ran outside the bar. Bello also gave a second affidavit to Hawkins in which he related that two black men came in the side door and started shooting.

In December 1975, Bello testified before an Essex County Grand Jury. He said then that as he entered the tavern, he noticed a white Dodge at the side of the building. Two black males entered by the side door and began shooting. He went out the front door and, as he turned left, he ran into a white man. He then turned in the other direction and saw Carter and Artis. At the 1976 trial Bello returned to his original story. He testified that Carter and Artis were the two men he had seen outside the Lafayette Bar and Grill carrying a shotgun and pistol, respectively.

Officers Greenough and John Unger were the first police to reach the scene in response to a radio report of the shooting. They were flagged down by Bello who was standing by the curb. Sergeant Robert Tanis and Officer John Nativo were on patrol when they received a radio alert at about 2:34 a.m. They had been traveling west on Broadway. They turned around and went east on Broadway to East 18th Street and then headed north toward the tavern. While traveling on East 18th Street near Hamilton Street, they observed a white car turn into 12th

Avenue. See Appendix I, which is a map of the area and shows the routes of the vehicles involved.

Sergeant Theodore Capter and Officer Angelo DeChellis were on patrol on 17th Avenue near East 24th Street, when they received the same radio alert. While driving up East 24th Street toward the tavern, they saw a white car with out-of-state plates cross the intersection of East 24th Street and 12th Avenue traveling east on 12th Avenue. Immediately thereafter, Capter and DeChellis were told that the getaway car was white and was occupied by two black males. Surmising that the car would be headed to New York, they proceeded down 10th Avenue. This route would allow them to reach the bridge over the Passaic River more rapidly than a vehicle going down 12th Avenue, which ends several blocks west of the River. When the officers reached the bridge and Route 4, they did not see the white car. They turned around and returned on Broadway, which is an extension of Route 4. As they approached East 28th Street, a white car crossed in front of them. They stopped it at the corner of East 28th Street and 14th Avenue. It was 2:40 a.m., six minutes after the initial radio alert.

The white car with its New York license plates and butterfly taillights was occupied by Artis, Carter and a third man, John Royster. Capter checked Artis's driver's license and the registration and let the car go. Capter and his partner proceeded to the Lafayette Bar. When they arrived, Bello described the car he had seen. Capter testified that upon hearing this description, "I looked at my partner and he looked at me and we took off looking for the car again." They proceeded down East 18th Street and saw the same car at the intersection of Broadway and East 18th Street. They pulled the car over. Only Carter and Artis were in it. After the patrol car of Sergeant Tanis and Officer Nativo arrived, they escorted Carter's vehicle to the Lafayette Bar.

The Carter-Artis vehicle was then driven to police headquarters and was searched. The police found a 12-gauge shotgun

shell in the trunk and a red .32 caliber S & W long shell on the floor alongside the front seat. Both were live shells. The seven spent bullets located at or near the scene were identified as .32 caliber S & W long shells. The unfired bullet found on the front floor in the car was the same caliber and would fit in the same gun from which the spent bullets had been shot. Further, a ballistic expert testified that the same weapon could be used to shoot the 12-gauge shotgun shell found in the trunk and the shotgun shells found in the tavern.

The automobile search did not uncover any pistol or shotgun. Bello had testified that Carter had a shotgun and Artis a pistol but no weapon was found in the car or on their persons when apprehended. Moreover, the attire of Carter and Artis was not the same as described by the witnesses. Valentine testified that one of the two men wore a hat and both wore sports jackets. Officer Capter said that Carter was wearing a hat and sports jacket and Artis was not wearing a sports jacket when first stopped by the police.

The State contended that the jury could reasonably infer that after leaving the bar, the Carter vehicle stopped at Eddie Rawls' home at the corner of East 28th Street and 12th Avenue and deposited the weapons and some clothing there. Rawls, the bartender at the Nite Spot, was well acquainted with Carter and was a close friend of Artis. He was the stepson of Leroy Holloway, a black bartender who had been shot to death by a white man in a dispute over a business matter several hours before the Lafayette Bar murders.

The movement of the car and the fact that several minutes had elapsed between the time the car was first spotted and when it was stopped by Sergeant Capter could justify this inference. Sergeant Capter saw the white car speeding across 12th Avenue at 24th Street and he stopped the car at 14th Avenue and East 28th Street. Carter and Artis could have stopped briefly at Rawls' house before proceeding to the point where Capter pulled the car over. See Appendix I.

Some consideration may also be given to the testimony of three alibi witnesses who had testified in 1967. Welton Deary stated at the first trial that he was at the Nite Spot, located five blocks south of the Lafayette Bar on East 18th Street, at 2:00 a.m. on June 17, 1966 and he had seen Rubin Carter with Catherine McGuire and her mother. He further testified that Carter told him that he was going to drive them home and then he would return. At the 1976 trial Deary admitted that these statements were not true and that he realized it when he testified in 1967.

Catherine McGuire also testified at the 1967 trial. At that time she indicated that Carter brought her home at about 2:15 on the morning of June 17, 1966 and that he left around 2:30. At the 1976 trial she testified that this was not true and that she was aware of this in 1967. Catherine McGuire also testified that she had received a letter from Carter while he was in the Bergen County Jail in which he asked her to remember that he had brought her home at 2:30 a. m. on June 17. Anna Brown, Catherine McGuire's mother, offered similar alibi testimony in 1967, but stated at the 1976 trial that it was untrue.

Although William Hardney did not testify in 1967, he did appear at the second trial. He related a conversation that he had had with Carter in which the latter asked him to support his story that he left the Nite Spot around 2:30 a. m. on June 17, 1966 with two girls. In fact, Hardney had not seen Carter at that time.

The trial court's conclusion that the verdict was not contrary to the weight of the evidence is well-founded. It is highly unlikely that more than one white 1966 Dodge with New York license plates was roaming around this area in Paterson about 2:30 on a Friday morning. The identification of the car by Valentine and Bello, related to the police at the time, was strong evidence that the killers drove away in that car after committing the murders. Carter and Artis were picked up in that car within thirty minutes after the shooting, and Carter

admitted that no one else had used the car that night. The bullet found in the car matched the caliber discovered at the scene. There was also "consciousness of guilt" evidence in the solicitation of false testimony, as well as the identification by Bello, and evidence of motive discussed herein. The jury could and did reasonably arrive at its conclusion.

## II

### Evidence of Racial Motive

At the pretrial conference held a month prior to the retrial, the State advised that it would offer evidence to show that the motive for the murder was revenge for the killing earlier that evening of a black bar owner, Leroy Holloway. At the first trial, the defense had argued that the State had not established any reason for Carter and Artis to have committed the murders. Now, the prosecution was prepared to advance evidence to demonstrate their motive.

 It is well established that the prosecution may introduce evidence of motive. See 1 Wigmore, Evidence § 118, at 558–59 (3d ed. 1940); 1 Wharton, Criminal Evidence § 170, at 314–15 (13th ed. 1972). Its purpose is to aid the jury, particularly in a case resting upon circumstantial evidence, in determining who the person was who committed the crime.

A wide range is permitted with respect to the nature of the evidence that may be introduced. Wharton expressed this thought:

> In the introduction of evidence to show motive, a wide range is permitted. Thus, any evidence which logically tends to show a motive, or which fairly tends to explain the conduct of the accused, should be permitted. In order for evidence of motive to be admissible, it is not necessary that each part of it be sufficient to prove the motive. The facts supplying a motive may be adduced in connection with other evidence in the case. [1 Wharton, Criminal Evidence, supra, § 170 at 316–18]

We have adhered to this doctrine. In State v. Rogers, 19 N.J. 218 (1955), the prosecution's introduction of evidence to show that the defendant had been indebted to the murder victim and

was motivated at least in part by a desire to wipe out these loan obligations was permitted. Justice Wachenfeld, writing for a unanimous court, approved. He wrote:

> In criminal prosecutions, whenever the motive or the intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues.... Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist. Such intent or motive may be proved either by direct or circumstantial evidence. All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense. [*Id.* at 228]

Our courts have continued to follow *Rogers. See State v. Baldwin,* 47 *N.J.* 379, 391 (1966) (evidence that defendant killed victim to silence him as a prospective witness held proper); *State v. Royster,* 57 *N.J.* 472, 484–85 (1971) (evidence that defendant threatened victim several weeks before murder permitted). This is the majority rule throughout the country. *See* 22A *C.J.S. Criminal Law* § 614 (1961 & Supp. 1982); 29 *Am.Jur.* 2d, *Evidence* § 363 (1967).

*State v. Mathis,* 47 *N.J.* 455 (1966), relied upon by the defendants, is not to the contrary. The prosecutor cross-examined the defendant with respect to how much money he had at the time of the murder and when he had last worked. The trial court ruled that it would not permit proof of financial need unless the State would also show that things of value were stolen and that thereafter defendant was affluent. In approving this ruling, Chief Justice Weintraub agreed that evidence of lack of money alone is not sufficient to prove motive because "it would prove too much against too many." *Id.* at 471. Citing *Rogers* approvingly, he stated that "there must be something more than poverty to tie a defendant into a criminal milieu." *Id.* at 472. By analogy the defendants argue that proof they are black and members of a class is not sufficient justification to tie them into the murders. However, the flaw in this position is their failure to acknowledge all the pieces in the pattern of this heinous crime. Defendants' membership in the class was not their only tie to the motive.

Interestingly, racial revenge was first injected into the trial by the defendants when they put in evidence a taped interview of Bello by then Lieutenant Vincent DeSimone, which referred to the belief that the motive for the shootings was "for the reason of revenge because there had been a shooting earlier." The defendant had also elicited on cross-examination of Detective LaConte that as part of his investigation of the murders he had been present at the funeral of Leroy Holloway.

Holloway was the bartender and owner of the Waltz Inn, a bar frequented by black patrons and located in a predominantly black neighborhood. The tavern was situated a few blocks away from the Lafayette Bar. About 8:15 p.m. on June 16, 1966, a white man entered the Waltz Inn and killed Holloway with a blast from a shotgun. A little more than six hours later, two black men entered the Lafayette Bar located at the border between black and white areas and, using a shotgun, killed the white bartender and several patrons. This bartender had been known to refuse to serve blacks. There was also evidence that neither the bartender nor the patrons were robbed. There was money on the bar and those killed had money in their wallets when the police arrived.

A series of events between these two crimes lend further support to the relationship between the murder and racial revenge. After Holloway's shooting, part of the local black community became enraged. A crowd gathered outside the Waltz Inn. News of the upset spread. Artis heard about it while on the street. Carter also knew there was going to be "some trouble." Neither of them knew what had provoked the slaying. While in the Nite Spot Carter heard talk of a "shaking" (retaliatory action). Carter and Artis had more than a passing interest because of Eddie Rawls. Rawls, Holloway's stepson, was the bartender at the Nite Spot. Carter, a professional prizefighter, frequented the Nite Spot almost every day and had a special reserved table there known as the "Champ's Corner." Carter and Rawls were "pretty good friends." Artis was very friendly with Rawls.

Holloway died around 10:00 p.m. An agitated Rawls, accompanied by two friends, went to the police station and demanded to know what was being done about the shooting of his stepfather. Rawls threatened that if the police did not take care of it, they would. Shortly thereafter Carter saw Rawls at the Nite Spot where Carter expressed his condolences to Rawls and they talked about the murder. Then Carter began a search for guns that had been stolen from his training camp. One of the missing guns was a 12-gauge shotgun. Thereafter, Carter and Artis stopped in at several local bars where they continued to hear talk of a shaking. At around 1:00 a.m. Carter again met with Rawls, this time at Ritchie's Hideaway. They remained there for about a half hour. Carter and Artis were later seen back at the Nite Spot which they had left at closing time, 2:15 a.m. Approximately fifteen minutes later, two black men entered the Lafayette Bar and Grill, and, without uttering a single word, shot and killed the white bartender and patrons.

Rawls was seen in the group that gathered at the Lafayette Bar after the shootings at about 3:00 a.m. After Carter and Artis were charged with the murder, Rawls assisted in bringing "alibi" witnesses to defense counsel to be interviewed. Several of these witnesses later testified at the retrial that their alibi testimony in 1967 had been fabricated.

Defendants contend that the evidence introduced in support of the racial revenge theory was not probative of defendants' guilt and, secondly, even if it were found to be probative, it was too prejudicial to be admitted. Moreover, in their petition to this Court, defendants stress that the State's summation improperly injected racial prejudice into the jury's consideration. For the reasons that follow, we reject each of these claims.

Defense counsel err when they insist that the State's theory impermissibly casts all blacks as being motivated to seek retribution when a black person is murdered by a white person. There is no place in the courtroom for any such group labelling. The evidence offered by the State against Carter and Artis was

admissible not because they are blacks, but because they were members of the particular local community involved and had a special relationship to Holloway through his stepson Rawls. Artis was a good friend of Rawls and Carter was well acquainted with him. Fueled by the racial overtone, the defendants may have been motivated to avenge the death of Rawls' stepfather. At least it was for the jury to decide whether, under these circumstances, Carter and Artis's relationship to Rawls could impel them to retaliate for one murder by randomly killing others. *See State v. Rogers,* 19 *N.J.* at 230 (any circumstance may be put in evidence that tends to make the proposition at issue either more or less probable); 1 *Wigmore, supra,* § 118 (test of relevance is whether the evidence offered tends to prove the emotion alleged by the prosecution to be present).

The defendants claim that irrespective of the relevance of the motive evidence, its impact was so inflammatory that the jury was improperly swayed in its deliberations. However, "evidence as to motive is admissible even though it may be prejudicial in the sense that it will arouse or inflame the jury against the defendant." 1 *Wharton, Criminal Evidence, supra,* § 170, at 316. There is nothing inherently wrong with advancing a theory of revenge as a motive for murder, if the facts bear out the theory.

 Whether the probative value of the evidence is outweighed by the potential prejudice is a decision left to the discretion of the trial judge. *See Evid.R.* 4, Comment 1. The party seeking to preclude the admission of evidence must convince the court that the factors favoring exclusion substantially outweigh the probative value of the contested evidence. *Cf. State v. Sands,* 76 *N.J.* 127 (1978) (whether prior convictions may be excluded as too prejudicial). On appellate review, the decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted. *See State v. Rogers,* 19 *N.J.* at 229; *Evid.R.* 4, Comment 2.

Here the trial court, having the "feel" of the case and after carefully considering the arguments of both the prosecution and the defense, decided to admit the evidence on motive. The Appellate Division found no abuse of discretion and no manifest denial of justice. We cannot say that on this record the Appellate Division's review of the trial court's action missed the mark so that a new trial is warranted.

Related to the evidentiary argument is the defendants' claim that the State's summation was an unacceptable appeal to racial prejudice, and, as such, violated the defendants' due process rights to a fair trial. The summation must be considered as a whole. The prosecutor's argument tied in the racial aspect of the revenge motive and constituted proper comment. Moreover, we note that defendants' objection to this part of the summation was not directed to the comment concerning motive, but to the analogy of the antipathy between citizens of different countries as "things outside this courtroom." Defendants have not established a case of plain error, the applicable standard under these circumstances. *State v. Thornton*, 38 *N.J.* 380, 396 (1962), *cert.* denied, 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.2d* 1039 (1963).

The defendants rely on a number of cases to show that the prosecutor's argument constituted an improper appeal to racial prejudice. We find those cases inapposite. In *McFarland v. Smith*, 611 *F.2d* 414 (2d Cir. 1979), the prosecutor urged the jury to credit a police officer's testimony because the probability of truthfulness was increased when one black person testified against another. The court held the remarks improper. As Judge Newman explained in that opinion, this notion, in the absence of any support in the evidence for the underlying assumption, is illogical because it is not probative of the likelihood that accusing testimony by someone within the same group is more credible than accusing testimony between people of different groups. *See id.* at 418. Here, the prosecutor's argument is logical; it attempts to make the racial revenge theory

more credible by demonstrating how ethnic prejudice may cause people to engage in senseless acts.

In *Withers v. United States*, 602 *F*.2d 124, 126 (6th Cir. 1979), the court found that a prosecutor's argument that not one white person had supported the defendant's story was improper. Similarly, in *United States ex rel. Haynes v. McKendrick*, 481 *F*.2d 152, 155, 160 (2d Cir. 1973), the court found that repeated, derogatory group references to blacks—"their" intelligence, "their" sexual promiscuity, "their" manner of dress—constituted a violation of defendant's right under the due process clause to a fair trial.

Here, despite the defendants' repeated protestations in their briefs and appellate oral arguments to the contrary, the prosecutor's advocacy attributed no qualities to a generalized class of blacks. The prosecutor did not ask the jury to believe that blacks in general possess an instinct to commit senseless violence that would lead any one of them to murder whites. Rather, he urged them to find that these two particular black men, Carter and Artis, committed the Lafayette Bar murders in retaliation for the slaying of a friend's stepfather. His remarks were not tangential asides to the jury designed to arouse latent racial hostility, *see Kelly v. Stone*, 514 *F*.2d 18, 19 (9th Cir. 1975), but were directed to one element of the State's case. "When a prosecutor's summation includes remarks in an effort to persuade a jury to return a guilty verdict, the resulting conviction is constitutionally unfair *unless the remarks are .abundantly justified.*" *McFarland v. Smith*, 611 *F*.2d at 416–17 (emphasis added). We find that the argument set out in this case is justifiable because it was relevant to the issue of motive, there being evidence in the record to support that proposition.

## III

### *Brady* Violation

■ Defendants claim that they are entitled to a new trial because the prosecution withheld material evidence favorable to

them, in violation of *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963). Because the record before us on this point was inadequate to support final appellate resolution, the matter was remanded to the trial court for a full evidentiary hearing. 85 *N.J.* at 303.

At issue on remand was the prosecution's alleged suppression of information concerning an August 7, 1976 polygraph examination of Alfred Bello. The test was arranged by Passaic County Prosecutor Burrell Ives Humphreys, who wanted to evaluate, prior to the retrial, the credibility of Bello's 1967 trial testimony. He arranged for examinations by two polygraphers, Richard Arther and Leonard Harrelson. Arther concluded that Bello was truthful when he said that he believed that Carter was in the bar when the shootings took place; that Bello was on the street just after the shootings and saw Carter there; and that Bello was the first person to go inside the bar after the shootings.

According to Professor Harrelson's written report of the test, which was furnished to defense counsel, it was his opinion that Bello's testimony at the 1967 trial was true, and that the statement recanting his original statement was not true. The defense was unaware, however, that after the test, but before he submitted his written report, Professor Harrelson told Chief DeSimone that Bello was truthful when he said he was *inside* the Lafayette Bar prior to and at the time of the shootings. Since the 1967 trial testimony put Bello *outside* the Lafayette Bar at the time of the shootings, there was a serious discrepancy between Harrelson's written report, which affirmed that testimony, and his oral comments, which contradicted it.[1] The

---

[1]The conflict between Harrelson's written report and his oral statement apparently arose because Harrelson never read Bello's testimony and so was unaware that at the first trial Bello had said he was outside the bar when the shootings occurred. Thus, when Bello told Harrelson that he was inside the bar, Harrelson assumed that Bello was repeating the version to which he had testified at the first trial.

prosecution's failure to disclose Professor Harrelson's oral report to the defense forms the basis of the claimed *Brady* violation.

On the remand the trial court was instructed to make a threshold finding regarding the prosecution's knowledge of the ambiguity contained in Harrelson's report. The court was further to assess the suppressed information in the light of the requirements for finding a *Brady* violation. Finally, the court was to determine whether, even in the absence of a *Brady* violation, the information acquired by the defense since trial qualified as newly discovered evidence entitling the defendants to a new trial.

A hearing was held before Judge Leopizzi from May 18, 1981 to June 8, 1981. The court heard the testimony of Bello, Harrelson, Humphreys, Assistant Prosecutors Martin Kayne and Ronald Marmo, other employees in the Passaic County Prosecutor's Office during the period in question, and defense attorneys Myron Beldock and Lewis Steel. In an 80 page opinion Judge Leopizzi made detailed findings of fact, and concluded that although the prosecution "technically" failed to turn over information regarding Harrelson's oral report, that failure was justified in the circumstances. The court further found that the suppressed information was not material evidence favorable to the defense, within the meaning of *Brady v. Maryland*, nor did it meet the test established to determine if newly discovered evidence warrants a new trial. Although we consider that Harrelson's oral report of the polygraph test should have been revealed to the defense, we agree that a new trial is not warranted under either *Brady* or the newly discovered evidence test.

The rule established in *Brady v. Maryland, supra,* and its progeny provides that

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. [373 *U.S.* at 87, 83 *S.Ct.* at 1186, 10 *L.Ed.2d* at 218]

The *Brady* rule is invoked where information is discovered after trial "which had been known to the prosecution but unknown to the defense." *United States v. Agurs,* 427 *U.S.* 97, 103, 96 *S.Ct.* 2392, 2397, 49 *L.Ed.*2d 342, 349 (1976). The prosecutor is charged with knowledge of evidence in his file, "even if he has actually overlooked it." *Id.* at 110, 96 *S.Ct.* at 2400, 49 *L.Ed.*2d at 352. Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence. *Giglio v. United States,* 405 *U.S.* 150, 92 *S.Ct.* 763, 31 *L.Ed.*2d 104 (1972); *United States ex rel. Marzeno v. Gengler,* 574 *F.*2d 730 (3d Cir. 1978); *United States v. Dansker,* 565 *F.*2d 1262 (3d Cir. 1977), *cert.* dismissed, 434 *U.S.* 1052, 98 *S.Ct.* 905, 54 *L.Ed.*2d 805 (1978). This Court has observed that the State's obligation to disclose is "not limited to evidence that affirmatively tends to establish a defendant's innocence but would include any information material and favorable to a defendant's cause even where the evidence concerns only the credibility of a State's witness." *State v. Carter,* 69 *N.J.* at 433.

It is undisputed that Harrelson's oral report was known to the prosecution but unknown to the defense. Chief Assistant Prosecutor Kayne testified that after the test, Harrelson told Chief DeSimone that Bello had been in the bar at the time of the shootings. Prosecutor Humphreys was informed by his staff of Harrelson's conclusion and he discussed the matter with Harrelson in a lengthy telephone conversation. Although the prosecution claims that Harrelson's oral report was so preliminary and tentative as to be beyond the scope of discovery, Harrelson himself testified that he did not at any time indicate that his oral report was preliminary or that he was unsure of the accuracy of the results. The prosecution nevertheless contends that the written report was accepted in good faith as accurate, complete and definite, and that it was justified in thinking that the written report superseded any oral comments.

We accept the trial court's finding that the oral report was not preliminary and that the defense failed to prove that the prosecution intentionally misrepresented the results of the polygraph test, or attempted to manipulate Harrelson and dictate the contents of his final report. In determining whether prosecutorial nondisclosure violates due process, the good faith or bad faith of the prosecution is irrelevant. *Brady v. Maryland*, 373 *U.S.* at 87, 83 *S.Ct.* at 1197, 10 *L.Ed.*2d at 218. Ordinarily such a report should have been disclosed to the defendants. However, there remains for consideration whether this undisclosed information was "material" to the defense, so that the defendants were denied due process and a fair trial.

Nondisclosure of evidence favorable to the accused violates the constitutional right of due process only "where the evidence is material to guilt or punishment." *Id.* at 87, 83 *S.Ct.* at 1197, 10 *L.Ed.*2d at 218. In making the often difficult determination of what is "material" we look to the factual circumstances of the particular case. Where the prosecution has knowingly used perjured testimony, the undisclosed information is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 *U.S.* at 103–04, 96 *S.Ct.* at 2397, 49 *L.Ed.*2d at 349–50. Where the defendant has made a specific request for information and the prosecution has failed to reveal the requested information, the standard of materiality is whether "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104, 96 *S.Ct.* at 2398, 49 *L.Ed.*2d at 350. Finally, when no request is made by the defendant or only a general request is made, information not revealed by the prosecutor will be considered material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist. . . ." *Id.* at 112, 96 *S.Ct.* at 2401, 49 *L.Ed.*2d at 355.

In this case it is undisputed that the defense requested all information concerning Bello's polygraph. The test of materiality, then, is whether knowledge of the suppressed oral report might have affected the outcome of the trial.

■ The "might have affected the outcome of the trial" test is not translatable into the mere possibility that the undisclosed information might have helped the defense. Otherwise, the test would call for automatic reversal.[2] There must be a real possibility that the evidence would have affected the result. This becomes apparent when it is realized that the "might have affected the outcome" criterion is the intermediate standard in the *Brady* sliding scale. The most stringent standard to be applied, when the prosecutor uses perjured testimony, is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." The least stringent standard is whether the undisclosed evidence would create a "reasonable doubt that did not otherwise exist." Arguably, then, under the "might have affected the outcome" test, the defendant must show more than a reasonable likelihood that the evidence could have changed the jury verdict.[3]

■ Some federal courts have held that the "might have affected the outcome" test is synonymous with harmless error. *United States v. Goldberg*, 582 *F*.2d 483, 489 (9th Cir. 1978), *cert.* denied, 440 *U.S.* 973, 99 *S.Ct.* 1538, 59 *L.Ed.*2d 790 (1979). *See also Chavis v. North Carolina*, 637 *F*.2d 213, 223 (4th Cir. 1980). The harmless error test explicated by the federal courts is whether the error was harmless beyond a reasonable doubt, namely, whether there was a "reasonable possibility" that the error would have affected the result. *See United States v. Goldberg*, 582 *F*.2d at 489, holding that the standard in *Chapman v. California*, 386 *U.S.* 18, 87 *S.Ct.* 824, 17 *L.Ed.*2d 705 (1967), of

---

[2]Though the common law required reversal for any error, that rule was rejected many years ago. See *R.* 2:10–2; *Fed.R.Crim.P.* 52(a).

[3]Judge Lacey in *United States v. Dansker*, 449 *F.Supp.* 1057 (D.N.J.1977), remanded for evidentiary hearing, 565 *F*.2d 1262 (3d Cir. 1977), *cert.* dismissed, 434 *U.S.* 1052, 98 *S.Ct.* 905, 54 *L.Ed.*2d 805 (1978), argues that the test on failure to respond to a specific request is whether there is any reasonable likelihood that production of the omitted evidence could have affected the jury's verdict.

"'harmless beyond a reasonable doubt' requires a new trial whenever there is a reasonable possibility that the error materially affected the verdict." There must be a real possibility that the defendant was denied a fair trial. We choose to apply the harmless error criterion.[4] In doing so, we must be mindful that we are reviewing the trial court's decision that the nondisclosure of Harrelson's oral report "in no way would or could have affected the outcome" of the trial.

Evidence that is merely cumulative does not create a reasonable possibility that the verdict would have been affected. In *Goldberg* the government's case consisted primarily of the testimony of Newman, a fellow employee. The prosecutor had failed to respond to a specific request for production of Newman's notes, which could have been used to illustrate Newman's cooperation with the government in the hope of receiving lenient treatment. The court held that this evidence was merely cumulative and not material to the issue of guilt. Therefore, there was "no reasonable possibility that . . . use [of the notes]

---

[4]Chief Justice Weintraub in *State v. Macon*, 57 *N.J.* 325 (1971), discussed the *Chapman* test in the following analysis:

No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. We say "possibility" and not "certainty," for if it were certain that the error led to an unjust result, the reviewing court would be constrained to order the just result, which, on that hypothesis, would be an acquittal, except in the unusual case in which it could be said the error prevented the trier of facts from even reaching the merits. So, too, a "probability" that the error resulted in a false verdict should, if it were the standard for intervention, drive the appellate court to order the judgment which the jury "probably" would have reached but for that error. And since a reviewing court could rarely say an error either certainly or probably induced a false verdict, either test would disadvantage a defendant. Defendants fare better if a new trial may be ordered upon a "possibility" of injustice. Still, not "any" possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. [*Id.* at 335–36]

at trial would have had a material effect on the verdict." 582 F. 2d at 490.

In *DeMartino v. Weidenburner*, 616 F.2d 708 (3d Cir. 1980), the defendant had been found guilty of accepting a $3,000 bribe as chairman of the municipal Alcoholic Beverage Commission. The defense was that the tavern owner paid the money to the defendant who was to use the funds to obtain a lawyer to represent the owner on a gambling charge, it being alleged that the gambling occurred at the tavern. Despite non-compliance with a specific request for certain documents, Judge Higginbotham pointed out that some of the documents were not material because the evidence was cumulative. He quoted from *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 735 (3d Cir. 1978):

A conviction need not be vacated because evidence that is 'merely repetitious' or 'cumulative' has not been revealed to the defendant.

In *Zeigler v. Callahan,* 659 F.2d 254 (1st Cir. 1981), the alleged *Brady* violation concerned evidence that could have been used to impeach the credibility of a government witness. The court held that the evidence was cumulative and not material, the witness's credibility having been fully explored on cross-examination by competent counsel. The court wrote:

Where [the omitted evidence] is merely cumulative, however, courts generally reject the contention that such evidence is material. *See Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring); *United States v. Imbruglia,* 617 F.2d [1] at 7; *United States v. Shelton,* 588 F.2d 1242, 1248 (9th Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979). This is true even where there has been a specific defense request for the information, *see DeMartino v. Weidenburner,* 616 F.2d 708, 710–13 (3d Cir. 1980), and the information, if disclosed, could have been used to impeach a "key" prosecution witness, *see United States v. Previte,* 648 F.2d [73] at 85; *United States v. Goldberg,* 582 F.2d 483, 490 (9th Cir. 1978), cert. denied, 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979) (prior history omitted); *Lewinski v. Ristaino,* 448 F.Supp. 690, 694–96 (D.Mass.1978), so long as the defense had an adequate opportunity to impeach the witness by other means.

Although Lincoln's credibility was not the most critical issue in this case, his credibility was thoroughly impeached on cross-examination by competent counsel. The information contained in the undisclosed statements did not relate to the substance of Lincoln's testimony. It was merely cumulative impeachment evidence and much of it was obviously known to defense counsel prior to trial, as

it was extensively covered on cross-examination and in argument. Under these circumstances, even assuming the defense request for the statements was sufficiently specific to trigger the more rigorous standard of materiality set forth in *Agurs*, 427 *U.S.* at 104, 96 *S.Ct.* at 2397, we cannot say that the statements might have affected the outcome of the trial. [*Id.* at 266–67]

The defense claims it could have used knowledge of the polygraph results not only to directly impeach Bello's testimony, but to show that the return to his 1967 trial testimony was prompted by the State's misrepresentation of the polygraph results. Thus, Bello would have been shown to be an extremely malleable witness whose testimony was manipulated by the State.

Had the defense used its knowledge of the Harrelson polygraph test to impeach Bello, however, the results of the test would surely have come to the attention of the jury. Both attorneys for defendants testified at the hearing on remand that had the oral report been disclosed, they would have brought out the polygraph examination and its results at trial. Although polygraph evidence is ordinarily not admissible in criminal cases, an exception occurs when the State and the defendant enter into a stipulation to introduce the results in evidence. *See State v. McDavitt*, 62 *N.J.* 36 (1972); *State v. Christopher*, 149 *N.J.Super.* 269 (App.Div.1977). The State would presumably have entered into such a stipulation, since it contends that evidence associated with Harrelson's examination of Bello would have added great strength to the State's case.[5]

The Harrelson test results, if laid before the jury, would have established that an eminent polygrapher entertained "no doubt at all" that Bello was truthful when he identified the defendants as the murderers. Harrelson testified at the remand hearing that it was his opinion, based on the Bello polygraph examination, that Carter and Artis alone were responsible for the shootings at the Lafayette Bar. Harrelson explicitly asked

---

[5]The Assistant Prosecutor stated at oral argument that the State would not have opposed the use of the polygraph test.

Bello, during the course of the examination, whether he had seen two men inside the bar with guns. Bello answered no. Asked if he had seen Carter and Artis outside the Lafayette Bar with weapons, Bello answered yes. Based on his analysis of Bello's responses, Harrelson concluded that there were no others involved. The test results thus lend no support to Bello's previous "in-the-bar" narratives, given to Assemblyman Hawkins and to an Essex County Grand Jury in 1975. In those stories Bello was inside the bar when two men—*not* Carter and Artis—entered through the side door and began shooting. Carter and Artis were seen in the vicinity of the bar with weapons. Had he been called as a witness at defendants' trial, Harrelson would have testified "that Mr. Bello was telling the truth when he identified Carter and Artis as the murderers." The Harrelson test results varied from the trial testimony only in terms of *where Bello was at the time of the shootings*; in both versions Carter and Artis were seen with weapons outside the bar; in neither version did Bello witness the shootings.

In deciding whether the Harrelson test results might have affected the outcome of the case, we must weigh the value of further impeaching Bello against the strongly inculpatory nature of the test results and Harrelson testimony. Bello's credibility had been subject to exhaustive attack during the trial and he was questioned at length regarding his various conflicting stories. The defense's cross-examination of Bello occupied the better part of five days and covers 600 transcript pages. The trial court observed: "His credibility was severely and repeatedly assailed from every conceivable angle through the lengthy and extensive cross-examination over a period of several days." He was questioned closely about discrepancies between his trial testimony and previous narrations. He was examined extensively on pressures and coercion by the prosecution to induce him to return to his 1967 trial testimony. His criminal record and his history of blackouts and alcoholism were fully explored. The trial court found:

> The jury was fully aware of Bello's criminal background and other unlawful
> activities. He was portrayed before the jury as a perjurer, liar and thief.
> Certainly the cross-examination of these experienced lawyers had not portrayed
> Bello as a person of integrity and honesty. Despite this, Bello left the stand
> unshaken as to identification of the defendants.

Given the length and scope of the defense's attack on Bello's testimony, there is no reasonable likelihood that further impeaching evidence would have affected the outcome of the trial. The added inconsistency that Bello told Harrelson that he was in the bar was merely cumulative.

This is particularly so in view of the wealth of other evidence amassed against the defendants. Bello's testimony that he saw Carter and Artis outside the bar immediately after the shootings did not stand alone. A substantial portion of his testimony was strongly supported by Mrs. Valentine. It is undisputed that Bello was at the Lafayette Bar immediately after the shootings. Immediately after the gunshots, Mrs. Valentine had paused only to look out the window before throwing on a raincoat and running downstairs to the tavern. Bello was at the door when she arrived. It was Bello who flagged down a police car. Bello's testimony that he saw a white car with out-of-state license plates and distinctive triangular tail-lights was likewise corroborated by Mrs. Valentine's independent testimony. Mrs. Valentine also saw two black men run to a car of that description and drive away. Both Bello and Mrs. Valentine gave comparable descriptions of the car to the police. When Carter's car was brought to the Lafayette Bar shortly afterward, both Bello and Mrs. Valentine identified it as the car they had seen leaving the scene.

In addition to this eyewitness testimony, defendants were implicated by considerable circumstantial evidence. The Carter-Artis car was seen in the vicinity of the Lafayette Bar within minutes of the shootings. In the car were found a shotgun shell and a .32 caliber shell, both of the same kind as the spent shells found at the murder scene. A motive for the killings—revenge for the murder of Leroy Holloway—was adequately established.

Finally, consciousness of guilt was suggested by Carter's solicitation of false alibi testimony. Given the weight of the evidence accumulated against the defendants, further impeachment of Bello on a point not central to his identification of them would not have been material to the outcome.

Although we hold that the prosecution's failure to disclose the Harrelson oral report was not constitutional error, it is the better practice, where the materiality of the requested information is in issue, either to furnish the information or to submit the matter to the trial court. In discussing the prosecutor's duty to voluntarily submit information, the Supreme Court in *Agurs* counseled prosecutors to err on the side of disclosure.

Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure. [427 *U.S.* at 108, 96 *S.Ct.* at 2399, 49 *L.Ed.*2d at 352]

That advice has equal application here. The prosecutor could not have known, prior to the development of the complete record at trial, what significance the oral report might have. Since the oral report certainly fell within the scope of requested information, it should have been disclosed to the defense along with Harrelson's written report.

We had also directed the trial court on remand to explore "precisely what use the prosecution made of Harrelson's report in confronting Bello" prior to the second trial. 85 *N.J.* at 315. The trial court made the following findings:

(13) The prosecution did not cause Bello to recant his recantation through coercion, deceit, or threats of prosecution for perjury; nor did the State misrepresent to Bello the results of the polygraph test to get Bello to go back to the "on the street" version;

(14) Bello recanted the recantation when he told Harrelson during the polygraph pre-test interview that Raab, Hogan and Levinson pressured him into recanting the 1967 trial testimony. . . .

Those findings are supported fully by the record. *See State v. Johnson*, 42 *N.J.* 146, 162–64 (1964). Kayne and DeSimone were the first persons who interviewed Bello after receipt of the Harrelson report. At that time Bello had already disclosed to

Harrelson that the recantation of his 1967 trial testimony was not true. It was not the State's misuse of the polygraph test that caused Bello to revert back to his 1967 trial testimony. Neither Kayne nor DeSimone used the polygraph test to coerce or deceive Bello for the purpose of having him switch back to the "on the street version."

The dissent contends that the trial court erred in finding that the Harrelson report was not used to get Bello to go back to his 1967 trial testimony. It bases this contention on Assistant Prosecutor Marmo's testimony and the letter written by Prosecutor Humphreys to Attorney General Hyland. Marmo's testimony and the prosecutor's letter indicate that Bello, when faced with the Harrelson report, admitted that the Essex County story was untrue. The part of the Harrelson polygraph report used for this purpose, contrary to the position expressed by the dissent, was true and accurate. In the Essex County in-the-bar version, Bello saw two men, not Carter and Artis, enter the tavern and start shooting, and he saw Carter and Artis in the vicinity of the bar. In the Harrelson version Bello was inside, but did not witness the shooting; he did, however, see Carter and Artis outside the bar with weapons immediately after the shooting. No reference was made to any other persons. The significance of the Essex County in-the-bar version was that two other persons had committed the murders. The Harrelson report and the 1967 trial testimony, on the other hand, agreed that only Carter and Artis were on the scene. Marmo's testimony and the Humphreys letter do not undercut the trial court's finding that the State did not misrepresent the results of the polygraph test to get Bello to return to the 1967 trial testimony. Thus, the dissent's reliance on Marmo's testimony and the Humphreys letter is misplaced. Moreover, there was no inconsistency, as the dissent claims, between the reports of the polygraphers Harrelson and Arther; both concluded that Bello saw Carter and Artis outside the bar after the shootings.

## IV

## Newly Discovered Evidence

Defendants contend that they are entitled to a new trial because the information that has come to light concerning Harrelson's oral report constitutes newly discovered evidence. Before a defendant is entitled to a new trial on this ground, it must be established that the new evidence is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." *State v. Carter*, 85 *N.J.* at 314. See *R.* 4:50–1(b). All three tests must be met before the evidence can justify a new trial. *State v. Johnson*, 34 *N.J.* 212, 223 (1961). Defendants have failed to satisfy any of these tests.

For the reasons outlined in our discussion of the *Brady* violation, we hold that the evidence of Harrelson's oral report is neither material nor of the sort that would lead to a change in the jury's verdict. Further, we agree with the trial court that the evidence could have been discovered before or during trial through the exercise of reasonable diligence. On September 14, 1976, 27 days prior to trial, Harrelson's written report was turned over to the defense. The report included a long narrative, the product of the pre-test interview, in which Bello described what happened inside the bar at the time of the shootings. The test report also included the specific test questions that Harrelson asked, and Bello's responses. To the questions, "Were you inside the Lafayette Lounge as you say?", "Were you inside the lounge when you heard the shots?" and "Were you inside the bar when you heard the shots?", Bello answered yes. In view of Harrelson's conclusion that Bello's 1967 testimony was true, Bello's narration and the answers to the test questions should have alerted a careful defense attorney to the need to investigate the Harrelson report further.

This is particularly so since defense attorneys were aware of an article that appeared in the *New York Daily News* on September 1, 1976, which referred to "the inability of key witnesses to pass lie tests on their testimony that Carter and Artis actually committed the killings." Artis's counsel referred to this article during the September 8, 1976 argument on a motion for change of venue and dismissal of the indictment. He noted that the article contained specific information about the Bello test. As the trial court observed in its opinion after remand, the *Daily News* article coupled with the seemingly inconsistent written report of Bello's polygraph test were sufficient to alert the defense to the need to investigate further.

## V

### Improperly Admitted Evidence

Carter, while incarcerated, had written letters to two prospective alibi witnesses. The trial court ruled these letters were inadmissible when the State could not establish how or when it obtained them. Though it found the letters were obtained in violation of the Fourth Amendment, the trial court permitted the State to use these letters to refresh the recollection of the witnesses. Defendants claim that testimony predicated on this recollection violated the exclusionary rule since the prosecution obtained "use" of the evidence despite the constitutional violation. *See Wong Sun v. United States*, 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.2d* 441 (1963).

This rationale ignores the established distinction between a document that is evidential and one used to refresh a witness's recollection. Once a proper foundation has been laid, a witness may examine any document to refresh his memory. The oft-quoted statement of Lord Ellenborough in *Henry v. Lee*, 2 *Chitty* 124, 124 (1814), sets forth the general rule:

> [I]f upon looking at any document he can so far refresh his memory as to recollect a circumstance, it is sufficient; and it makes no difference that the memorandum is not written by himself, for it is not the memorandum that is the evidence but the recollection of the witness.

Preliminarily the trial court must decide whether the memorandum does refresh the witness's recollection. It may decline to permit its use where the danger of undue suggestion outweighs the probable value of the evidence. In making this decision the trial court may consider the nature of the memorandum and the witness's testimony, including cross-examination, by which counsel may test the witness's credibility that his memory has been revived. *McCormick, Evidence* (2d ed. 1972), § 9, at 14–19.

The admissible evidence is the recollection of the witness, and not the extrinsic paper. *See Marti v. Standard Fire Insurance Co.*, 127 *N.J.L.* 591 (E. & A. 1942); 3 *Wigmore, Evidence* (Chadbourn rev. ed. 1970), § 758, at 125–28. The test is whether the witness puts before the court his independent recollection and knowledge. *Zimmer v. Westinghouse Electric Corp.*, 26 *N.J.* 339, 351 (1958). This test was met here.

Defendants also argue that the testimony of William Hardney, a friend of Carter, was unreliable because it was the product of illegal conduct by the prosecution and its admission violated their due process rights. William Hardney originally told detectives that he was with Carter at the Nite Spot at the time of the killings. In October 1976 he was questioned by five police officers who came to his house at 1:00 a. m. He could not reach his lawyer, but the police remained and told him they wanted to hear his version of what occurred. Hardney repeated the Carter alibi story.

Thereafter, the police advised Hardney that his wife and he were to be arrested and charged with obstruction of justice. When Hardney was told by his lawyer to tell the truth, he admitted that he had been lying about the Nite Spot story and that he had not been there with Carter on the morning of June 17. Less than a week later, at his lawyer's office, he reiterated the truth to the police. The prosecution's conduct is not to be condoned, but the pressure did not affect the witness's competency. The matter was brought out on cross-examination to challenge the reliability of Hardney's testimony. We find defendants' charge of a due process violation to be wanting.

## VI

### Bello as a Witness

Defendants argue that the State should not have been permitted to use Bello as a witness. The contention is based on several factors. First, Bello was unreliable. He had made seven sworn statements, some of which were inconsistent with each other, he had committed other crimes, and he had received promises of favorable treatment from the State. Second, the prosecutors had "failed to take any steps whatsoever to ensure reliability of Bello's version of events." The argument is without merit.

Evidence Rule 7 provides that "every person is qualified to be a witness" except as otherwise provided in the Rules or by other law of this State. The declared policy is that generally everyone is qualified to be a witness and give relevant evidence. *Germann v. Matriss*, 55 *N.J.* 193, 216 (1970). Witness disqualification is an exception. *State v. Briley*, 53 *N.J.* 498, 506 (1969). In the absence of a specific rule of exclusion, a witness should be permitted to testify. *Cf. State in Interest of R. R., Jr.*, 79 *N.J.* 97 (1979) (age *per se* does not render a proposed witness incompetent; rather, under *Evid. R.* 17, a court should decide whether a person is incapable of expressing himself or understanding the duty to tell the truth).

Defendants do not point to Bello's conviction of any crimes, but even convictions would not preclude the State from presenting him as a witness. *See State v. Fox*, 12 *N.J.Super.* 132, 139 (App.Div.1951). Moreover, promises from the State and inconsistent statements were properly matters for the jury's consideration. Lastly, the prosecution had acted in good faith to verify before trial Bello's expected testimony. As discussed *supra*, at 118–119 there was substantial verification of much of Bello's version. The extent to which his testimony was to be believed was for the jury.

## VII

### Prosecutorial Misconduct

■ Defendants claim that the prosecutor overstepped the bounds of propriety when he attempted to explain to the jury the apparent discrepancy between the time elapsed and distance traveled by the white car on the first two occasions it was observed by the police. The prosecutor argued:

Now, the police officers had traveled all the way from Twelfth to Tenth, all the way along there, all the way along here, all the way along Route 4 some distance for New York and all the way back and the defense says well, of course, we couldn't be this speeding white car, couldn't be Carter and Artis because, look, one, two, three, four, five, he had only gone five blocks while the police officers had gone all this distance. Therefore, the speeding white car that they saw was not our car. It was some other car. But, there is one thing that they overlook; Mr. Rawls' house right there. You put this pointer between these two points where Officer Kapter [sic] saw the automobile and where Mr. Carter and Artis were stopped and it forms a triangle with Mr. Rawls' house. So simple, really, ladies and gentlemen. There is not two white cars that are speeding along. *There is one car and this white car makes a stop at Mr. Rawls' house. What did they do? They get rid of the hat, get rid of a coat, dump some guns, pick up Mr. Royster.* Maybe they pick up Mr. Royster back here at the Nite Spot as they are coming down East 18th Street and as Officers Nativo or Tanis see them turning onto Twelfth Avenue. [Emphasis added]

Defendants claim that the prosecutor presented the above underlined statement as a fact. However, these conclusions were inferences that the jury could draw from proven facts.

A prosecutor may comment on the facts shown by or reasonably to be inferred from the evidence. *State v. Farrell,* 61 *N.J.* 99, 102 (1972); *State v. Johnson,* 31 *N.J.* 489 (1960); *State v. Bogen,* 13 *N.J.* 137 (1953). There is no error so long as he confines himself in that fashion. Ultimately it was for the jury to decide whether to draw the inferences the prosecutor urged.

■ The defense counsel also allege that the prosecution intentionally misled them as to the theory under which Carter and Artis would be tried. The defense claims that the State represented in March 1976 that it would argue that four persons were involved in the shootings: two, not Carter and Artis, did

the shooting at the time when Bello was in the bar; and Bello saw Carter and Artis on the street as he fled from the bar.

However, the State never amended the 1966 indictment or its responses to the bill of particulars. By late September 1976, the defense knew that Bello had reverted to his 1967 story and that the 1966 bill of particulars would stand. On September 27, 1976, Judge Marchese had clarified the bill of particulars to reflect the State's position that Carter and Artis fired the shots that killed the victims and that no other persons fired any shots in the bar.

An intentional, misleading misrepresentation as to the factual theory upon which the State proposes to rely may constitute a basic unfairness where the defendant has relied upon such misrepresentation in preparation of the defense. The Appellate Division in *State v. Laganella*, 144 *N.J.Super.* 268 (App.Div. 1976), appeal dismissed, 74 *N.J.* 256 (1976), after emphasizing the absence of evidence of misrepresentation in that case, commented:

> This conclusion eliminates any vice from the State's unwillingness to produce the witness, for it is an unfair representation that offends due process and not trial strategy. Clearly the prosecutor of a criminal indictment at trial has wide discretion with respect to the production of proofs. [*Id.* at 280]

In this case there is no evidence of misrepresentation with respect to the theory upon which the State intended to proceed.

Defendants further contend that the prosecutor's remarks in summation about Carter's grand jury testimony violated the right to remain silent. The prosecutor made the following argument about Carter's grand jury testimony:

> [A]nd, of course, there is Mr. Carter's testimony before the Grand Jury which was read to you. There was talk of a shake among certain persons in the black community. There was talk about a retaliation.
>
> Now the defense says well, Mr. Carter wouldn't have said that unless he was uninvolved. Is that so? He is before this Grand Jury. What was it, which Grand Jury? He knows he is being examined. He knows the police aren't that dumb. He knows there is talk of a retaliation and a shake. What is he going to say, there wasn't any? He is going to say yeah, there was talk of retaliation, a shake, but not me. It was going on in the Nite Spot. It was going on in the front of the bar and I was. . . .

The Fifth Amendment, applicable to the States by reason of the Fourteenth Amendment, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 *U.S.* 609, 615, 85 *S.Ct.* 1229, 1233, 14 *L.Ed.2d* 106, 110, reh. denied, 381 *U.S.* 957, 85 *S.Ct.* 1797, 14 *L.Ed.2d* 730 (1965); *State v. Lanzo*, 44 *N.J.* 560 (1965). The prosecutor may, however, comment on the evidence in the record and argue about the significance of the testimony introduced at the trial. *State v. Sinclair*, 49 *N.J.* 525, 548 (1967). In doing so, the prosecutor must clearly avoid reflecting upon a defendant's Fifth Amendment right to remain silent.

Here Carter's grand jury testimony had been read to the jury and the prosecutor's comment was a fair evaluation of that testimony. No objection was made at trial that this comment violated defendant's right to remain silent and we fail to discern how this comment violated any such right. The prosecutor also referred to the failure to produce evidence that an insurance claim had been made by Carter for some stolen guns. However, production of that evidence would not have required calling Carter, and therefore there was no violation of his right to remain silent.

The defendants also assert that the prosecutor's comments on the defendants' failure to produce certain witnesses— Rawls, Richard Solomon and Stanley Van Ness—was improper. *State v. Clawans*, 38 *N.J.* 162 (1962), sets forth the guidelines concerning inferences that may be drawn from failure to produce a witness. It must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved. *Id.* at 171. It has been said that failure to call a witness available to both parties precludes raising an inference against either. *O'Neil v. Bilotta*, 18 *N.J.Super.* 82, 86 (App.Div.), aff'd, 10 *N.J.* 308 (1952). However, that statement may not necessarily be true. Where one party has superior knowledge of

the identity of a witness or of what testimony might be expected or where a certain relationship, such as employer-employee, exists between the witness and a party, the adverse inference may properly be argued to the jury. In *Clawans* we pointed out that if the trial court were requested to make such a charge, counsel should make that request out of the presence of the jury at the close of the adversary's case. The court could then be advised of and consider all the circumstances before deciding whether the request is proper. 38 *N.J.* at 172. The same practice should be followed if comments are to be made in summation. It is only after all the particulars are disclosed that the trial court may properly determine whether the inference should be urged in summation.

Each of the witnesses not produced here could have provided testimony superior to that adduced on the particular matter. Generally the material referred to was of a minor character. The reference to Van Ness arose during the testimony of Fred Hogan, an investigator in the Public Defender's office. He had played a part in obtaining Bello's recantation statement. There was conflicting evidence concerning Hogan's motivation, it appearing that he was to share in the proceeds of a book to be written. Hogan testified that Van Ness, the Public Defender, knew some facts that would support his version. The prosecutor said:

> Where was Mr. Van Ness? He wasn't called by the defendant. [Hogan] said he told other people about this. Where are the other people? They weren't called by the defendants.

▮ Referring to the same subject, the prosecutor also argued:

> Mr. Solomon, where is he in this courtroom? ... He has the movie rights to Mr. Carter's book. Where is he to discuss what he did in this investigation? Why didn't the defense put him on the stand?

The defense did not object to either of these suggested adverse inferences advanced by the prosecutor. If they had objected and stated their reasons, the trial court would have been in a position to judge whether the objections were sound. We do not find that the failure to have explored the defendants' explana-

tion for nonproduction of these witnesses constitutes plain error. *See State v. Melvin*, 67 *N.J.* 1, 18–19 (1974).

The third comment about which the defendants complain was the prosecutor's charge that the defendants did not produce Rawls. Defense counsel's objection was sustained and the jury immediately instructed to disregard the statement. Any error was cured by the trial court's limiting instruction.

## VIII

### Juror Misconduct

The defendants contend that a number of jurors were biased or had been exposed to racially prejudicial remarks during the retrial. Defendants also claimed that some jurors had been informed of negative results of lie detector tests taken by the defendants. The trial court held extensive hearings on these charges and made detailed findings leading to the conclusion that the defendants' charges were unfounded. We agree with the Appellate Division that the trial court's findings of fact and conclusions of law dismissing defendants' claims are fully supportable.

## IX

### In-Court Identification of Artis

Artis claims that the identification evidence linking him to the crime was impermissibly suggestive and inadmissible. "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977). That entails a measurement of the "totality of the circumstances" and consideration of factors such as "the opportunity of the witness to view the criminal at the time of the crime, the witness'

degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 *U.S.* 188, 199, 93 *S.Ct.* 375, 382, 34 *L.Ed.2d* 401, 411 (1972).

■ Here, Artis objects to his police escort to the scene shortly after the crime. Far from being conducive to misidentification, confrontation immediately after a crime promotes fairness to the accused by allowing a viewing while the witness's mental image of the perpetrator is still fresh. *Stewart v. United States*, 418 *F.2d* 1110, 1113 (D.C.Cir.1969). *See also State v. Wilkerson*, 60 *N.J.* 452, 461–62 (1972); *United States ex rel. Gomes v. New Jersey*, 464 *F.2d* 686, 688 (3d Cir. 1972). Artis also questions the interview that Bello had with then Lieutenant DeSimone on October 11, 1966 at which time Bello was shown a photograph of Artis. This objection ignores the fact that Bello never made an identification on the basis of any photographs of the defendants. In fact, Bello said that the photographs did not resemble the defendants. Rather, his identification was based on the opportunity he had to view them at the scene.

Even if bringing the car to the scene was suggestive, the totality of the circumstances indicates that the identification was reliable. Bello had time to view the killers as they walked toward him on a well-lit street. It is likely that he was attentive since he thought the two were detectives and he himself was involved in a crime being committed down the block. His description did not exactly match Artis's appearance. However, Bello maintained that although he could not indicate any particular features, the two men brought to the scene were the same ones he had seen walking down the street. Less than half an hour had elapsed between the time Bello saw the murderers on the street and the time Carter and Artis were brought to the Lafayette Bar.

■ Defendant's objection goes to the credibility of Bello's identification rather than to any significant due process problems. It is really a challenge that bears on the proper weight to be accorded his testimony. Impeachment of credibility is best dealt with on cross-examination. We find that the identification testimony was properly admitted.

■ Artis further contends that it was error for the trial court to refuse his requested identification charge. We disagree. Although the court failed to instruct the jury specifically as to the witness's state of mind and opportunity to observe, the charge did include the essential requirements:

> The burden is on the State to prove beyond a reasonable doubt not only that the offense was committed as alleged in the indictment, but also that the defendants are the persons who committed it. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendants before you may convict one or the other or both. If the circumstances of the identification do not convince you beyond a reasonable doubt you must find the defendants not guilty. You must weigh and consider all of the evidence, including contradictions and inconsistencies in the evidence, including the question of identification and the weight to be given such identification, and if after considering and weighing all the evidence you are not satisfied beyond a reasonable doubt that Rubin Carter and/or John Artis have been accurately and been unmistakenly identified as the attackers, you must find them not guilty.
>
> In this case the defendants have denied the charge and claimed that they were not at the scene of the crime at the time of its commission. *The identification testimony is to be received by you with great caution.* [Emphasis added]

If the subject matter is adequately covered in the text and purport of the whole charge, there is no prejudicial error. *State v. Thompson,* 59 *N.J.* 396, 411 (1971). Such is the case here.

## X

We have reviewed the numerous other alleged errors and find no merit in them.

The judgments of conviction are affirmed.

# APPENDIX I

Paterson (vicinity of crime) *

LEGEND:

⟶ white car sighted

⊗ white car containing Carter and Artis stopped

····· route taken by police officers Nativo and Tanis when they see a white car at (b)

----- route taken by police officers Capter and DeChellis when they see a white car at (c), attempt to find it on Route 4, see a white car cross Broadway at (d) and stop Carter and Artis at (e)

xxxx route taken by Capter and DeChellis when they stop Carter and Artis at (f) and escort them to the bar

a. Mrs. Valentine sees white car drive away from the bar.
b. Nativo and Tanis see white car turn onto 12th Ave. from E. 18th St.
c. Capter and DeChellis see white car speed by on 12th Ave. at E. 24th St.
d. Capter and DeChellis see white car crossing Broadway on E. 28th Street.
e. Capter and DeChellis pursue the white car and stop Carter and Artis on E. 28th St. at 14th Ave. The police let the car go and proceed to the bar.
f. Capter and DeChellis leave the bar, stop the Carter-Artis car at E. 18th St. and Broadway and escort them to the bar.

*This map is not drawn to scale. Streets not relevant to this case, e.g., 15th Ave. and 16th Ave., are omitted.

CLIFFORD, J., dissenting.

A more egregious *Brady*[1] violation than the one presented by this case is difficult to imagine. One need not go so far as to impugn the motives of the prosecution in order to reach that conclusion, for it can just as easily be attributed to an appalling lack of basic communicative skills on the part of the principal polygraphist and various members of the prosecution team. But whether the circumstances originate in unworthy motives, colossal bungling, or plain dullness of comprehension, the fact remains that the misunderstandings thus created have proven to be costly indeed: the State withheld from the defendants material evidence favorable to them in connection with the Harrelson polygraph and, unknown to defendants and their counsel, compounded the error by using the mistaken and erroneous polygraph report to get the prime witness against defendants to change his story again and go back to his original testimony given at the first trial. That all adds up to a deprivation of due process and requires a reversal of defendants' convictions.

I

As our earlier opinion indicates, by the time the 1976 trial approached, the prosecution was understandably anxious about the credibility of Alfred Bello, the key identification witness. *State v. Carter*, 85 *N.J.* 300, 307 (1981). Bello had offered so many variations of his original "on-the-street" theme that that theme had receded into the background and the "in-the-bar" variations had become predominant. 85 *N.J.* at 305–07. Therefore, the State arranged for Bello to be subjected on August 7, 1976 to a polygraph examination by Leonard H. Harrelson. The purpose of the examination was to evaluate Bello's credibility, including, as the former prosecutor testified at the remand hearing, "whether he was telling the truth or lying when he said he was in the bar at the time of the shootings."

---

[1] *Brady v. Maryland*, 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.2d* 215 (1963).

Harrelson concluded that Bello was telling the truth when he said he was in the bar both before and at the time of the shootings. The polygraphist told members of the prosecution team shortly after the test had been completed that that was his opinion, and he persisted in it in the face of prosecution efforts to convince him it was "impossible." Harrelson has never waivered in that conclusion and, as was apparent on the remand hearing, believes it to this day.

For reasons that can charitably be described as unfortunate, in his later written report of his test the polygraphist summarized his findings with the opinion that Bello's 1967 trial testimony (which contained the "on-the-street" version) was "true": unfortunate, because Harrelson had never read Bello's 1967 testimony and no representative of the prosecution had enlightened him as to that testimony and hence he was plainly—and grievously—mistaken as to the location from which Bello said, in 1967, that he had witnessed the events before and after the slayings; doubly unfortunate, because although the State continued to promote the notion that Harrelson's "in-the-bar" conclusion was only tentative,[2] Harrelson specifically and adamantly insisted that he never used those or any similar words or ever made the statement to "anyone at all on the face of the earth that [he] was unsure of Bello's test results * * * "; and, most unfortunate of all, because the prosecution never told the defense the critical finding of Harrelson's test—that Bello was in the bar.

Although the trial court on our remand determined that the prosecution was under no obligation to disclose to the defense the contents of Harrelson's oral report, the Court wisely has rejected that conclusion, *ante* at 119. I agree with the majority in that regard and further in its apparent acknowledgement, *ante* at 112, that the undisclosed information was favorable to

---

[2]The trial court on remand adopted the same position to the extent that it determined that "the State was justified in its impression that Harrelson's oral report was preliminary or tentative and subject for further review."

the defendants. See *State v. Carter*, 69 *N.J.* 420, 432–33 (1976). It is in the final step of the analysis, namely, whether this undisclosed favorable evidence was "material" to the defense for *Brady* purposes, that I part company with the Court.

## II

Whether Harrelson's undisclosed certitude that Bello was in the bar before and at the time of the shootings is "material" in the *Brady* sense turns on whether that evidence "might have affected the outcome of the trial." *United States v. Agurs*, 427 *U.S.* 97, 104, 96 *S.Ct.* 2392, 2397, 49 *L.Ed.2d* 342, 350 (1976), quoted in *State v. Carter, supra*, 85 *N.J.* at 313. That determination in turn rests in this case on two related factors: first, what use the prosecution made of the *ostensible*, but unintended, conclusion in Harrelson's written report—that the polygraph indicated Bello was on the street during the shootings; and second, what use the defense would have made of the *intended*, but undisclosed, Harrelson oral opinion—that the polygraph confirmed that Bello was in the bar both before and during the shootings.

## –A–

Our earlier opinion adverts to the prosecution's use of the Harrelson document:

After receipt of Harrelson's report two representatives of the prosecution interviewed Bello on September 14 and 15, 1976; and while the record is far from clear on the use, if any, made of the polygraph report during that confrontation, the fact is that at the conclusion thereof Bello retreated from his "in-the-bar" story and returned to his 1967 account.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

An additional area ripe for exploration at the evidentiary hearing on remand is precisely what use the prosecution made of Harrelson's report in confronting Bello on September 14 and 15, 1976, prior to the second trial. The State argues that at the September 1976 interviews, Bello gave Chief Assistant Prosecutor Kayne and Chief DeSimone a detailed account of the various pressures and inducements that resulted in his recantation [of his 1967 "on-the-street" version], explained the basis for his [in-the-bar] statements to Assemblyman Hawkins and the Essex County Grand Jury, and thereupon returned to his 1967 trial version of the shootings. During the course of the 1976 trial, both Prosecutor Hum-

phreys and Assistant Prosecutor Marmo told the court that the lie detector tests were instrumental in getting Bello back to the "on-the-street" version. The hearing on remand should explore how the polygraphist's report was linked to that result. [85 *N.J.* at 309, 315]

In some respects the evidentiary hearing on remand was not particularly helpful in establishing precisely how the polygraph test had been used. Chief DeSimone had died before the hearing, Messrs. Humphreys and Kayne were vague, and Bello was useless. Mr. Kayne "assumed" that when he and DeSimone went to see Bello in September 1976, they had with them a copy of Harrelson's report and they "very well may have" discussed the test results with Bello, but Kayne had no "specific recollection of what [he and DeSimone] may have told Bello."

One exception to this otherwise universal failure of recollection is found in Assistant Prosecutor Marmo's testimony concerning what Bello had revealed to him:

When Bello would get in his testimony to the point where he was—where I was asking—brought him up to coming into the Prosecutor's Office telling the Essex County story, what happened to come back to the '66 story, he said I took the polygraph examination—or lie test, as he called it, the lie test showed that my testimony at the first trial was true; I knew the Essex County story was not true—he called it a fictionalized version—and I knew the Prosecutor's Office knew it *because the lie detector test showed it* and so I couldn't stick with the Essex County story—as you call it, the in the bar story—anymore, so I told the story that I told at the first trial, which is what happened (emphasis added).

This, coupled with the acknowledgement by both prosecutor Humphreys and Assistant Prosecutor Marmo during the 1976 trial, as noted in our earlier opinion, that "the lie detector tests were instrumental in getting Bello back to the 'on-the-street' version," 85 *N.J.* at 315, makes it abundantly clear that sometime after he had been subjected to the polygraph technique, Bello was confronted with the unintended "on-the-street" result of Harrelson's report, and that this confrontation caused him to return to his 1967 "on-the-street" version. That this is so is confirmed by documentary proof that surfaced at the evidentiary hearing on remand: a draft of a November 22, 1976 letter (coinciding with the conclusion of Bello's trial testimony) from Prosecutor Humphreys to Attorney General Hyland:

When we first interrogated Bello, he told us the Hawkins-Essex County Grand Jury story. (Bello *in* the bar—four men involved. Carter and Artis outside the bar with weapons.) He then disappeared. However, we found him in a far away state, arranged for his return and had Professor Haroldson [sic] examine him. Professor Haroldson concluded that Bello's 1967 trial testimony was the truth. We interrogated Bello further. Bello finally "broke" and has given us the whole story * * *.

The conclusion is thus inescapable that not only did the prosecution know that Harrelson's written report contradicted his findings regarding the vantage point from which Bello had supposedly made his pivotal observations, but they concealed the fact that the "wrong" test result was fed to Bello to "break" him.

This determination is in no way undermined by the trial court's finding, apparently adopted by the majority, *ante* at 119, that "Bello recanted the recantation when he told Harrelson during the polygraph pre-test interview that Raab, Hogan and Levinson pressured him into recanting the 1967 trial testimony * * *." What bearing that can have on the present inquiry is unclear at best, given the fact that after Bello recited those pressures, he thereupon turned around and told Harrelson, directly contrary to his 1967 testimony, that he was *in* the bar when the significant events occurred. And Harrelson said the polygraph confirmed that version. And he still says that.

–B–

There can be little doubt that the defendants could have used Harrelson's undisclosed opinion had they but known of it.

First, the defense could have attacked Bello's credibility in a more devastating fashion than any other evidence in the case allowed for. The polygraph report itself would have been admissible by what the Court correctly perceives, *ante* at 116, as the functional equivalent of a stipulation, see *State v. McDavitt*, 62 *N.J.* 36 (1972). Whether its admissibility would be limited to the *use* made of the report as distinguished from the *substance*—the scientific verification of the "truth"—is open to question. But for purposes of this case I submit it makes no difference to the result.

Were the evidence of Harrelson's report limited to the use the prosecution had made of it, defendants would have been in a position to argue that the State had persuaded Bello to return to the "on-the-street" version because that is what the "lie detector" results demanded. Marmo's recitation of Bello's reaction to the ostensible test results would tend to buttress that contention: Bello "told the story [he] told at the first trial" because the lie detector test showed the Essex County story was not true. See *supra* at 136. The argument to the jury would have been that Bello was such a malleable witness that he would have testified to either the "on-the-street" or the "in-the-bar" version depending upon what he was told the polygraph test showed.

Second, the defense would have been able to attack DeSimone (on the not unreasonable assumption that it was DeSimone who, with Kayne, confronted Bello with the report and thereby "turned him around") for concealing the polygraphist's conclusion that Bello was in fact in the bar.

Third, if the report were deemed to be admissible for its substance, defense counsel could have confronted Bello with Harrelson's "true" opinion—a dicey maneuver, to be sure, inasmuch as Harrelson was equally firm in his conclusion that Bello had in fact identified Carter as having been at the scene. But the ultimate answer to this has to be that that strategem was well worth the risk, for the culmination of all this wholly unnecessary confusion (so the argument would go) is that no one can believe *anything* that Bello says: he can confound two polygraphists, Harrelson and Arther, on the very same issue—whether he was in the bar or on the street—by getting results 180° removed from each other in tests given just weeks apart. Bear in mind that although, as the Court observes, *ante* at 116, the "Harrelson test results, if laid before the jury, would have established that an eminent polygrapher entertained 'no doubt at all' that Bello was truthful when he identified the defendants" as having been at the scene, this same "eminent polygrapher" likewise entertained "no doubt at all" that Bello was

equally truthful when he said he was in the bar before and at the time of the shootings. And an equally eminent polygraphist, Arther, was doubtless equally certain when he concluded that Bello was on the street. So much for the polygraph evidence.

–C–

Finally, to view the "added inconsistency that Bello told Harrelson that he was in the bar" as "merely cumulative," as the Court asserts, *ante* at 118, is to gloss over the essential nature of that inconsistency and misgauge its potential impact.

The inconsistency these proceedings have focused on goes to more than a witness's inconsistency in describing the physical characteristics of a defendant or the color socks he was wearing. It goes to the opportunity and ability Bello had to identify defendants and to describe their movements. Chances are that what one sees from a vantage point within a tavern as all hell breaks loose is not going to be the same as what one sees as one strolls up the sidewalk after the carnage. The defense attacks on Bello's "on-the-street" story would have proceeded from a wholly different perspective and in an entirely different framework.

Might all of this have affected the outcome of the trial? How can we say it might not have, given the real capacity for the additional information to bring about the utter destruction of by far the most important witness in the State's arsenal, with the fallout levelling the vaunted polygraphists and casting doubt on the tactics of the prosecution? Never before could defendants argue so persuasively that Bello was in all respects a complete, unvarnished liar, utterly incapable of speaking the truth. When, as here, a key witness's reliability might well have been determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the general rule that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution. See *Napue v. Illinois*, 360 *U.S.* 264, 79 *S.Ct.* 1173, 3 *L.Ed.*2d 1217 (1959); *Brady v.*

*Maryland, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1186, 10 *L.Ed.*2d at 218; *Giglio v. United States,* 405 *U.S.* 150, 153–54, 92 *S.Ct.* 763, 765–66, 31 *L.Ed.*2d 104, 108 (1972).

I would reverse and remand for a new trial.

Chief Justice WILENTZ and Justice SULLIVAN authorize me to record their concurrence in this opinion.

*For affirmance—Justice PASHMAN, SCHREIBER, HANDLER and POLLOCK-4.*

*For reversal—*Chief Justice WILENTZ and Justices SULLIVAN and CLIFFORD—3.