# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2820

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United States |
| v. | * | District Court for the District |
| | * | of South Dakota |
| Joseph T. Grassrope, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 12, 2003
Filed: September 12, 2003

_____

Before RILEY, HEANEY, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

ERICKSEN, District Judge.

Following a two-day jury trial,[2] Joseph T. Grassrope was found guilty of two counts of aggravated sexual abuse by force in violation of 18 U.S.C. § 2241(a)(1). The victim involved in both counts was a seventeen-year-old babysitter who cared for Grassrope's children. She testified that Grassrope pulled her into a bedroom, locked

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

the door, pushed her onto the bed, and forcibly raped her both vaginally and anally. Grassrope testified on his own behalf. He admitted that he engaged in vaginal and anal intercourse with the victim, and he asserted that the acts were consensual.

In this appeal, Grassrope contends: (1) that leading questions put to the victim deprived him of certain rights; (2) that post-trial statements by the victim provided new evidence to support Grassrope's request for a new trial; (3) that the government committed prosecutorial misconduct in closing argument; and (4) that his conduct qualified as a "single aberrant act" such that the trial court, in sentencing him, should have departed downward under the provisions of U.S.S.G. § 5K2.20.

## I.	QUESTIONS TO THE VICTIM

Grassrope asserts that the victim's testimony that his vaginal and anal contact with her included penetration came in response to improper leading questions. This, he argues, renders the evidence insufficient to sustain his convictions and also deprived him of the right to confront his accuser. The relevant testimony was as follows:

Q	All right, he's on top of you. What happens next?
A	He started taking off my pants.
Q	Okay. How did he do that?
A	With his left – or, his right hand.
Q	All right. Was he successful?
A	Yes, he was.
Q	Did any other parcels of your clothing come off?
A	Just my boxers and my underwear.
Q	What happened next?
A	(No response.)
Q	Did you understand my question?

A      Yes, I did.

Q      Did a part of his body touch a part of your body?

MS. MINER: Your Honor, objection.  Leading.

THE COURT: Overruled.  She may answer.

A      Yes.

BY MR. HANSON:

Q      What part of his body?

A      His penis.

Q      And what part of your body was touched at that time?

A      My vagina.

Q      Did his penis actually go into your vagina?

MS. MINER: Your Honor, I object as leading.

THE COURT: Sustained.

BY MR. HANSON:

Q      Was a part of his body - did a part of his body enter any part of your body at that time?

MS. MINER: Your Honor, objection.  Leading.

THE COURT: Overruled.

MR. HANSON: You can answer that, [victim's name redacted].

A      Yes.

BY MR. HANSON:

Q      Can you tell us that?

A      (No response.)

Q      Did you understand my question?

A      (No response.)

Q      [Victim's name redacted], can you answer that part?

A      (No response).

Q      Do you need to take a break?

A      Yes.

(Witness sobbing.)

MR. HANSON: Your Honor, can we take a short break?

THE COURT: Why don't you get her a glass of water, we will see how she does.

MR. HANSON: I guess I have one here, Your Honor.

BY MR. HANSON:

Q    [Victim's name redacted], to your knowledge, was anybody else in the house at this time?

A    No.

Q    And the two parts of the body that you've earlier described, what occurred with those? Can you tell the jury what happened?

A    (No response).

Q    Did you feel something?

A    Yes.

Q    Okay. And what part of your body did you feel it at?

A    My vagina.

Q    And what did you feel in that area?

A    (No response.)

Q    Was the defendant moving or was he still?

MS. MINER: Your Honor, I'm going to object, that's leading.

THE COURT: It isn't leading. Overruled.

BY MR. HANSON:

Q    Can you describe the movement that he was engaging in?

A    Up-and-down.

Q    Did that behavior change at some point in time or did it stay the same?

A    It changed.

Q    Okay. Can you describe what happened to the jury, please?

A    He stopped and he turned me over.

Q    Now you're laying which direction?

A    On my stomach.

Q    Okay. Facedown? [sic]

A    Yes.

Q    Okay. And did something more happen at that time?

A    Yes.

Q    What happened?

A    (No response).

Q    Did you understand my question? Is it difficult for you to describe this?

A    Yes.

Q    Did a part of his body touch another different part of your body?

A    Yes.

Q    Okay. What part of his body?

A    His penis.

Q    And what part of your body?

A    My anal.

Q    And did it actually go inside?

    MS. MINER: Your Honor, I would object, that's leading.

    THE COURT: It is. But it is overruled.

    MR. HANSON: That means you can answer.

A    Yes.

BY MR. HANSON:

Q    Okay. And did that happen in the earlier – in your vaginal area also?

    MS. MINER: --I would object. That's leading.

    THE COURT: It is. But it's overruled.


Rule 611(c) of the Federal Rules of Evidence provides:


Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

The Advisory Committee Notes to Rule 611(c) state that with respect to leading questions, "[t]he matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command." We defer to the trial court in determining when leading questions are necessary, and review for abuse of discretion. United States v. Stelivan, 125 F.3d 603, 608 (8th Cir. 1997).

It is not uncommon that the precise physiological details of sexual assault must be elicited by focused questioning. We have repeatedly upheld the use of leading questions to develop the testimony of sexual assault victims, particularly children. See United States v. Longie, 984 F.2d 955, 958-59 (8th Cir. 1993); United States v. Rossbach, 701 F.2d 713, 718 (8th Cir. 1983); United States v. Littlewind, 551 F.2d 244, 245 (8th Cir. 1977). According to Grassrope's own brief, the victim had already testified at the first trial, which ended in a mistrial, that there was penetration. Presumably she could have been rehabilitated with that if the cross-examination had attacked her testimony on the ground that the questions "fed" her the answers. See Fed. R. Evid. 801(d)(1). The defendant never disputed that he had penetrated the victim's vagina and anus with his penis. In fact, his counsel's opening statement began: "There's no question that on January 9th of this year Joe Grassrope had sex with [the victim]. The only question that you're going to be asked to decide is whether it was a consensual act or whether it was one of force."[3] We are satisfied that the district court did not abuse its discretion in allowing the government to use leading questions in its examination of the victim. Having determined that there was no error in the district court's rulings under Rule 611, we reject Grassrope's

---

[3]In his reply brief, Grassrope argues that he would not have testified that there was actual penetration unless the victim had already testified to improper leading questions. Having ordered the transcript of the opening statement ourselves, and discovering that it narrowed the issue to consent, we find Grassrope's argument on this point to be particularly unpersuasive.

arguments that they render the evidence against him insufficient and that his Sixth Amendment confrontation rights were violated.

## II.    "RECANTATION"

We now turn to Grassrope's motion for a new trial based on the victim's alleged recantation of her testimony.  The district court initially scheduled the matter for an evidentiary hearing, but cancelled the hearing after determining that no recantation had actually occurred.  The facts are well summarized in the district court's order denying the second motion for a new trial:

> [In connection with Grassrope's motion for a new trial] the court ordered . . . the production of two taped interviews conducted by an investigator for the Public Defenders' Office, one of James Ewing and one of the victim in this case.  The government provided those transcripts to the court and the court has read the transcript . . . Mr. Ewing claims the victim told him sometime in December of 2001 that the defendant had not raped her.  The transcript of the interview of the victim makes it clear that she is not recanting anything.  Instead, she has reaffirmed her testimony as given in the trial which resulted in a mistrial and the second trial which resulted in the conviction of the defendant.

> When the court ordered an evidentiary hearing, the court was under the impression that the victim had recanted.  That is not so although James Ewing claims it is.  Substantial questions exist as to the credibility of Mr. Ewing.  The victim claims that, when she talked with Ewing, he was heavily intoxicated whereas she had not been drinking. She did admit to telling him at first that the defendant had not raped her but explained the reason: she did not want him thinking she was a whore or slut.  She states, however, that she, in the same conversation, stated more than once that the defendant had raped her.  She claims Mr. Ewing is lying about her 'wanting to be with' the defendant and that Ewing has a motive to lie.  The victim has been heavily pressured by her mother to recant.  Neither her mother nor her stepfather are now supportive of the

victim. Community sentiment is also against her and in favor of the defendant. It is surprising that she refuses to recant, given all this trauma.

We have not been alerted to any inaccuracy in the foregoing factual recitation, and find no error in the trial court's denial of Grassrope's motion for a new trial based on the victim's alleged recantation.

## III.   CLOSING ARGUMENT

Grassrope makes several complaints about the prosecutor's conduct during closing argument. For the most part these arguments are without merit. There is one, though, that troubles us. During closing argument Grassrope's attorney said:

> Joseph Grassrope, as the defendant in this case, has one important advantage, and again it's the law that you're going to be given, a person who is charged with a crime, a defendant, has the presumption of innocence. That means as he sits here today he's presumed to be not guilty.

At that point the prosecutor objected: "Your Honor, I object. The evidence is in. That's before trial, not after the trial." That objection was plainly improper. As any federal prosecutor ought to realize, the presumption of innocence abides with a criminal defendant throughout his trial. Here, the objection was neither sustained nor overruled. The court said: "I believe that's correct. Well, just pay attention to the Court's instructions in that regard." When defense counsel resumed her argument after the objection, she said, "As [Grassrope] sits here he's covered with a blanket, basically, of innocence." The prosecutor did not object. In his rebuttal argument, the prosecutor told the jury to follow the Court's reasonable doubt instruction and not anything he or defense counsel said. Given after the closing arguments, the instructions themselves were without error. They clearly instructed that the

presumption of innocence alone is sufficient to find the defendant not guilty, that the presumption of innocence can be overcome only if the government proves, beyond a reasonable doubt, each essential element of the crimes charged, and that the defendant has no burden to prove innocence.

The prosecutor's speaking objection misstating the law on the presumption of innocence was improper. A new trial is required if that misconduct taken in the context of the entire trial prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. See United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996); United States v. Malone, 49 F.3d 393, 398 (8th Cir. 1995); United States v. McGuire, 45 F.3d 1177, 1189 (8th Cir. 1995), United States v. Emmert, 9 F.3d 699, 701 (8th Cir. 1993); United States v. Johnson, 968 F.2d 768, 770 (8th Cir. 1992). Having reviewed the trial transcript, we conclude that the improper remarks could not reasonably have affected the jury's verdict. See United States v. Alanis, 945 F.2d 1032, 1037 (8th Cir. 1991).

## IV. DENIAL OF DOWNWARD DEPARTURE

Finally, Grassrope appeals the district court's denial of his motion for a downward departure based on aberrant conduct. The court refused to consider a downward departure under U.S.S.G. § 5K2.20, which provides for downward departures in extraordinary cases if the defendant's criminal conduct constituted aberrant behavior. The departure is not available in cases involving serious bodily injury or death, and Application Note 1(i) to U.S.S.G. 1B1.1 provides that "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. 2241 or 2242 or any similar offense under state law." Grassrope argues that the "deeming" provision of 1B1.1 violates the Due Process Clause. For support, he relies on cases holding that an irrebuttable presumption violates the Due Process Clause if it relieves the government of meeting its burden of proof as to an essential element of the crime charged. The guideline

section in question has no impact on the burden of proof with respect to the charged crime and the authority cited by Grassrope is inapposite. Moreover, the argument that the applicable guideline is unconstitutional was not made to the district court, and has therefore been waived.

The judgment of the district court is AFFIRMED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.