# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1287

_____

United States of America,       *

     *

     Plaintiff-Appellee,      *

     *    Appeal from the United States

     v.      *    District Court for the District

     *    of South Dakota.

Juan Gerardo Rojas,      *

     *

     Defendant-Appellant.      *

_____

Submitted:  November 14, 2007
Filed:  March 28, 2008

_____

Before MELLOY, BEAM, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury convicted Defendant Juan Gerardo Rojas on charges of sexually abusing his former girlfriend's two daughters, K.H. and A.P., and physically assaulting the younger of the two girls, A.P.  The jury acquitted Defendant as to charges of assault with a deadly weapon related to a third child.  Following trial, A.P. purportedly recanted her testimony in separate conversations with her mother, Defendant's attorney, and an Assistant United States Attorney.

Defendant moved for a new trial and requested an evidentiary hearing based on the reported recantation.  The district court denied the request for a hearing and denied relief.  On appeal, Defendant challenges these rulings.  In addition, he raises a

sufficiency of the evidence argument and challenges two separate determinations related to the calculation of his advisory Guidelines sentencing range. We affirm as to the sufficiency of the evidence and the Guidelines determinations. Regarding the purportedly recanted testimony and the motion for a new trial, we hold that Defendant was entitled to an evidentiary hearing. Accordingly, we vacate the order denying a new trial and remand for an evidentiary hearing.

I.      Background

Defendant lived with A.P., K.H., and the girls' mother at various locations, some of which were on the Crow Creek Indian Reservation in South Dakota. Defendant and the girls' mother had two younger children together who also lived with them. Defendant and the mother ended their relationship, and Defendant began living with another woman, Sheila Carpenter, and her son, the boy involved with the count of acquittal. The boy's grandmothers noticed evidence of physical abuse, confronted Defendant, and reported the suspected abuse. Investigators went to the boy's home and discovered that he had lacerations on the palm side of his left wrist and abrasions under his chin. The boy stated that Defendant had cut him with a knife. A counseling professional involved with the boy's case knew that Defendant had previously lived with A.P., K.H., and their mother. The counselor advised the girls' mother to bring A.P. and K.H. in for questioning.

A.P. met with Ellen Cuny, a counselor for Indian Health Services in South Dakota. At Defendant's trial, Cuny testified regarding her discussions with A.P. During questioning by Cuny, A.P. was initially reluctant to talk about abuse, but according to Cuny, A.P. eventually opened like a "floodgate" and provided an extensive account regarding Defendant's physical and sexual abuse of her and physical abuse of her mother and K.H. Cuny arranged to have the girls talk to a second interviewer, Lora Hawkins at Black Hills Pediatrics in Rapid City, South Dakota. During the course of interviews with Hawkins, both girls made notations on

anatomical drawings to indicate the parts of their own bodies and Defendant's body involved in sexual contact. The annotated drawings were admitted into evidence.

A.P., K.H., their mother, and Lori Strong, an examining physician, also testified at Defendant's trial. A.P. was ten years old at the time of trial. She appeared to lose control of her emotions during her direct examination, and the government elicited her testimony largely through the use of leading questions. She stated that the abuse started around the time she entered kindergarten. A.P. described Defendant touching her between her legs, removing her clothes, and painfully penetrating her digitally and with his penis on repeated occasions over an extended period of time when they lived together in three different towns. She also described Defendant kissing her "like boyfriend and girlfriend," forcing her to touch his penis, and attempting to put his penis in her mouth. A.P. stated that she hadn't disclosed the sexual abuse prior to her meeting with Cuny because she was afraid of Defendant, she had seen Defendant beat her mother and K.H., and Defendant had threatened to kill himself if she told anyone about the sexual abuse.

A.P. also described an incident when Defendant beat her with a belt buckle and left bruises and pain that lasted for days. A.P.'s mother and older sister, K.H., confirmed that A.P. appeared to have been beaten by a buckle. A.P.'s mother testified that Defendant admitted to her that he beat A.P. with a belt and buckle, but the mother did not disclose the beating because she was personally afraid of Defendant and because Defendant controlled her actions at the time of the abuse. A.P. conceded on cross examination that she first disclosed the sexual abuse shortly after her mother had been in a fight with Sheila Carpenter in which her mother received two black eyes.

K.H. testified that she was about eight years old and in the second grade when she, her mother, and A.P. started living with Defendant. K.H. stated that from age nine to age thirteen, Defendant touched her over and under her clothing almost nightly and penetrated her digitally. K.H. testified that she didn't yell out during the abuse

-3-

because she was afraid of Defendant, and if she tried to push him away, he would hold her down. She first disclosed the abuse in her interview with Lora Hawkins in Rapid City. On cross examination, K.H. conceded that her first disclosure of abuse came shortly after her mother had the fight with Defendant's then-girlfriend Sheila Carpenter.

Physician Lori Strong, also of Black Hills Pediatrics, testified that she performed medical vaginal examinations of A.P. and K.H. and that her findings were normal. She testified, however, that there are a number of reasons exam results might be normal in the presence of sexual abuse.

Defendant is an enrolled member of the Crow Creek Sioux Tribe, and jurisdiction is proper. On June 8, 2006, the jury convicted Defendant of the following counts: Counts I and II, Aggravated Sexual Abuse of a Child (A.P.), in violation of 18 U.S.C. § 2241(c); Count III, the lesser-included offense of Simple Assault of a Child (A.P.), in violation of 18 U.S.C. § 113(a)(5); Count IV, the lesser-included offense of Assault by Striking, Beating and Wounding (A.P.), in violation of 18 U.S.C. § 113(a)(4); and Counts V and VI, Aggravated Sexual Contact With a Child (K.H.), in violation of 18 U.S.C. §§ 2241(c), 2244(a), and 2246(2)(D). The jury acquitted as to the charges regarding Defendant's alleged assault of the boy, Count VII, Assault With a Dangerous Weapon. After trial, Defendant was held in a county jail pending sentencing.

On July 24, 2006, Defendant's attorney submitted a motion for an evidentiary hearing and a new trial on Counts I and II regarding the sexual abuse of A.P. In the motion, Defendant's attorney stated that A.P.'s mother contacted him on June 23 and told him that A.P. recanted and admitted lying about Defendant. Defendant's attorney drove to A.P.'s home and interviewed her on July 10, at which time A.P. said she lied at trial because she was angry with Defendant for leaving her mother and for starting

a relationship with Sheila Carpenter. Defendant's attorney met with A.P. and K.H. on July 14, at which time A.P. again repeated her recantation.

Also on July 24, the district court sent a letter to the parties indicating its receipt of Defendant's motion. The court stated that sentencing was scheduled for September 18, the government should file a response to the motion, and the court would "then decide whether or not to conduct an evidentiary hearing."

On July 31, the government filed its response in resistance to Defendant's motion for a new trial. In the response, the Assistant United States Attorney (AUSA) who prosecuted the case stated that he had visited with A.P. and her mother on July 25. According to the AUSA, the mother told him that, around July 10, Defendant participated in a three-way call with her that had been arranged by a third party without her knowledge. In that call, Defendant claimed he still loved the mother and wanted to get back together with her. The mother then stated that Defendant had called the home about ten times and that she had allowed Defendant to talk to their younger children. At first, the mother stated that Defendant only talked to the younger children, but she later admitted that she also let him talk to A.P. According to the AUSA, she admitted that the conversation with Defendant probably caused A.P. to recant, and she also admitted that Defendant was "probably conning her to get her to help him."

The AUSA reported that he then spoke with A.P. and that she relayed the following information. A.P. said she had last talked to Defendant on July 24 at which time he claimed he still loved her and her mother and wanted to get their family back together. A.P. said that she still loved Defendant and that she was worried the younger children would not have a father because someone had told her Defendant would be in prison until A.P. was her mother's age. A.P. then stated that she had lied at trial. She initially stated that she had lied about the sexual abuse and the physical abuse with the belt buckle. When the AUSA confronted her with the fact that

Defendant admitted to A.P.'s mother that he hit A.P. with the belt, A.P. said that she testified truthfully about the beating, but lied at trial about the "sexual stuff."

On August 7, Defendant's attorney submitted a reply in further support of the motion for a new trial and to renew the request for an evidentiary hearing. On August 8, the district court entered an opinion, signed on August 4, denying the motion for a new trial and denying an evidentiary hearing. In the order, the district court emphasized being impressed with A.P. as a witness at trial and finding her credible at trial. In addition, the court noted generally and with specific reference to the present case that minors who are abuse victims are often plagued with feelings of guilt over family break-ups and other consequences attendant to the disclosure of abuse. The court also noted that it found A.P.'s claim that she lied about Defendant due to her anger over the relationship with Sheila Carpenter to be unbelievable. The court stated, instead, that this appeared to be a case of an abused woman, A.P.'s mother, being controlled by her abuser and manipulating her daughter in an attempt to please the abuser. Finally, we note that there were no affidavits or other evidence before the court and that the court specifically stated, "I accept what [Defendant's attorney], an officer of the court, states in his memorandum. I assume, for the purposes of the motion, that all such statements are true." At a later point in its written order, the district court stated, "As with [Defendant's attorney] I take what [the] AUSA . . . says to be true."

On September 12, Defendant filed a motion to reconsider accompanied by an affidavit from A.P.'s mother. In the affidavit, A.P.'s mother denied the AUSA's assertions about a three-way call. She also claimed that, after the trial, Defendant only talked to herself and the younger children except for (1) brief comments that may have been exchanged when A.P. answered the phone, and (2) one specific instance when A.P. spoke with Defendant and during which the mother was listening to what A.P. was saying. A.P.'s mother also denied stating that she believed Defendant was trying to con her and denied stating that a conversation with Defendant had caused A.P. to

recant. She emphasized that A.P. first recanted shortly after trial and before any of the post-trial phone calls from Defendant and that A.P. lied because she was upset with Defendant for breaking up their family. Finally, the mother denied pressuring A.P. to change her story. The district court did not rule on the motion to reconsider.

At sentencing, the district court made two contested rulings. First, applying U.S.S.G. Section 2A3.1(b)(1), the district court held that Defendant's threat to A.P.—that he would kill himself if she disclosed the abuse—qualified as "threatening . . . that any person will be subjected to death." 18 U.S.C. § 2241(a)(2) (as incorporated by U.S.S.G. § 2A3.1(b)(1)). Defendant argued that an offender's threat of suicide could not satisfy Section 2A3.1(b)(1). The district court rejected this argument and applied a four-level increase in Defendant's offense level. Second, applying U.S.S.G. Section 4B1.5(b), the district court held that the conduct giving rise to the current convictions—the repeated sexual abuse of A.P. and K.H.—qualified as a "pattern of activity involving prohibited sexual conduct" requiring a five level increase in Defendant's offense level. U.S.S.G. § 4B1.5(b). Defendant argued that an enhancement under Section 4B1.5(b) required a prior conviction for a sex offense and could not be based entirely on the conduct of the present offense. The district court rejected this argument.

The district court found that Defendant had a Category I criminal history, an overall offense level of 48, and a Guidelines range of life imprisonment. Ultimately, the district court imposed a sentence of life imprisonment on each of Counts I, II, and V, 12 months on Count III, 6 months on Count IV, and 120 months on Count VI, all to run concurrently.

Defendant appeals as to the sufficiency of the evidence, the two contested sentencing determinations, and the denial of his motion for an evidentiary hearing and a new trial.

II.    Discussion

A.    Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence only as to Counts I and II, the sexual abuse of A.P. His arguments are twofold. He claims the evidence was insufficient because the district court improperly permitted leading questions, thus hindering the reliability and usefulness of A.P.'s testimony, and because no corroborating medical evidence supported A.P.'s testimony.

We will affirm a conviction against claims of insufficient evidence unless the evidence, viewed in a light most favorable to the conviction, is such that no reasonable jury could have found guilt beyond a reasonable doubt. See United States v. Guenther, 470 F.3d 745, 747 (8th Cir. 2006). The use of leading questions with alleged victims who are minors is a matter of trial management that we review for abuse of discretion. See United States v. Flute, 363 F.3d 676, 678 (8th Cir. 2004); United States v. Butler, 56 F.3d 941, 943 (8th Cir. 1995); Fed. R. Evid. 611(c) advisory committee's note ("The matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command."). We have repeatedly allowed the use of leading questions with child-witnesses in sexual abuse cases, and we do not believe that the district court ran afoul of our precedent or abused its discretion by allowing the challenged questions and testimony in the present case. See United States v. Grassrope, 342 F.3d 866, 869 (8th Cir. 2003) ("It is not uncommon that the precise physiological details of sexual assault must be elicited by focused questioning. We have repeatedly upheld the use of leading questions to develop the testimony of sexual assault victims, particularly children."); Butler, 56 F.3d at 943 (noting that although leading questions on direct examination are generally prohibited, "[t]he child witness is a long-recognized exception to this rule"). Here, the AUSA asked several leading questions, some of which demanded yes or no answers and some of which

required or elicited further response or explanation by A.P. A.P. was ten years old at the time of trial. The record suggests that she was distraught during her testimony. In these circumstances, the use of leading questions does not make her testimony infirm or otherwise preclude the jury from relying on her testimony.

Regarding the absence of corroborating medical evidence, the examining physician clearly explained how the absence of medical evidence could be consistent with the sexual abuse as described by A.P. As a result, the jury was free to accept the physician's testimony and find abuse based on A.P.'s testimony, notwithstanding the absence of medical evidence. United States v. Kenyon, 397 F.3d 1071, 1076 (8th Cir. 2005) (affirming conviction for sexual abuse of a child where victim displayed no physical injuries); United States v. Kirkie, 261 F.3d 761, 768 (8th Cir. 2001) (affirming conviction for child sex abuse notwithstanding a lack of corroborating medical evidence). The physician explained how the affected area of the anatomy is highly vascular, and therefore, quick to heal. The physician also explained how examinations of the victims did not occur close in time to the alleged sexual abuse. Also, we note that the physician had extensive experience in the examination of sexual abuse victims, and Defendant does not challenge the physician's qualifications. The jury was entitled to rely upon the physician's explanation and A.P.'s testimony in light of that explanation, and the absence of corroborating medical evidence did not mandate an acquittal. Kenyon, 397 F.3d at 1076 ("It is well-established . . . that credibility is the province of the jury, and the jury was free to determine what weight should be given to [the victim's] testimony in light of the evidence cited by [Defendant].").

B.    U.S.S.G. § 2A3.1(b)(1)

We review interpretation of the Guidelines de novo. See United States v. Aguilar, 512 F.3d 485, 487 (8th Cir. 2008). Guidelines Section 2A3.1(b)(1) regarding "Criminal Sexual Abuse" contains a cross reference that calls for a four-level increase

in a defendant's offense level if the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) regarding "Aggravated Sexual Abuse." The cross-referenced code section entitled "By force or threat," includes the following conduct: "knowingly causing another person to engage in a sexual act . . . by threatening or placing that other person in fear that *any person* will be subjected to death, serious bodily injury, or kidnaping." 18 U.S.C. § 2241(a)(2) (emphasis added).

According to trial testimony, the defendant told A.P. he would kill himself if she disclosed the sexual abuse. Defendant argued below and argues on appeal that a threat of suicide can not satisfy the requirements of § 2241(a)(2). Rather, he argues, the threat must be against someone other than the offender, and the four-level enhancement of U.S.S.G. Section 2A3.1(b)(1) is inapplicable in this case. The district court held that the language "any person" in § 2241(a)(2) could include Defendant himself such that a threat of suicide could satisfy § 2241(a)(2). The district court's interpretation comports with the plain meaning of § 2241(a)(2), and we find this statutory language to be unambiguous. "Any person" is not inherently exclusive of the offender, and Congress commonly employs the words and phrases "another," "another person," and "other person" when they intend to identify an act or threat directed at persons other than the offender. See, e.g., 18 U.S.C. § 2241(a) ("knowingly causes *another person* to engage in a sexual act") (emphasis added); 18 U.S.C. § 2241(a)(1) ("by using force against *that other person*") (emphasis added). Especially in the case of a child-victim, an offender's threat of suicide is a particularly heinous tool to coerce compliance and secrecy. As in many cases of sexual abuse, the present offender was not a stranger to the victims, but a father-figure, a one-time member of the family home, and the father of the victims' younger siblings. Placing the responsibility for the possible death of the offender on the child-victim's shoulders is, we believe, precisely the kind of threatening and coercive conduct that Guidelines Section 2A3.1(b)(1) and U.S.C. § 2241(a)(2) intend to target.

-10-

C.   U.S.S.G. § 4B1.5(b)

Defendant also argues the district court erred by imposing a 5-level increase in his offense level based on the Guidelines' enhanced penalties for "Repeat and Dangerous Sex Offender Against Minors." U.S.S.G. § 4B1.5. He argues specifically that an increase based on U.S.S.G. Section 4B1.5 requires a prior conviction for a sex offense against a minor and that a sentencing court cannot rely solely on conduct involved in the present offense. If Defendant had been sentenced under subsection (a) of Section 4B1.5, this argument would have merit—subsection (a) expressly requires a prior conviction. Subsection (b), however, does not.

Subsection (b) applies in the specific circumstances when "neither § 4B1.1 nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct." U.S.S.G. § 4B1.5(b). Subsection (a) only applies if "the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction." U.S.S.G. § 4B1.5(a). Because subsection (b) applies specifically when subsection (a) does not, the plain language of the Guidelines support the view that subsection (b) applies when a defendant has no prior sex offense conviction. Further, the commentary explains that no prior conviction is required and that the conduct triggering the enhancement under subsection (b) may be the conduct of the present offense:

> An occasion of prohibited sexual conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion.

U.S.S.G. § 4B1.5(b) cmt. 4(B)(ii).

We now hold that subsection (b) may apply where there is no prior sex offense conviction and the only "pattern of . . . conduct" is conduct involved in the present

-11-

offense of conviction.  This is not the direct holding of any of our prior cases, but we believe it is the rule we must apply, as is apparent not only from the plain language of the Guidelines and the commentary, but also from the facts presented in a number of our prior cases addressing other arguments regarding Section 4B1.5(b).  Typically, these cases involved challenges based on alleged double-counting.  See, e.g., United States v. Fadl, 498 F.3d 862, 867 (8th Cir. 2007) (rejecting a double-counting argument in a case involving no reference to a prior offense and holding that "[t]he application of § 2G2.1(d)(1) punished Fadl for exploiting different minors, *while the § 4B1.5(b) enhancement punished him for exploiting those minors on multiple occasions*") (quotation omitted and emphasis added); United States v. Peck, 496 F.3d 885, 890 (8th Cir. 2007) ("A 'pattern of activity' for the purposes of § 4B1.5(b)(1) occurs when the defendant engages in the prohibited sexual conduct with a minor on at least two separate occasions. U.S.S.G. § 4B1.5, cmt. n. 4(B)(I)."); United States v. Sharpfish, 408 F.3d 507, 511 (8th Cir. 2005) (holding Section 4B1.5(b) applicable where "[t]he district court recited evidence that Sharpfish had sexually abused [the victim] often and repeatedly, as well as evidence that Sharpfish sexually abused [another victim] with his foot.").  In Fadl, Peck, and Sharpfish, we affirmed the application of subsection (b) without reference to prior convictions, and in Fadl, we made explicit reference to the fact that Section 4B1.5(b) was triggered by the exploitation involved in the offense conduct.  Defendant presents no authority suggesting that the plain language of the Guidelines or the commentary is ambiguous on this point, and we find no error in the district court's interpretation of this Guideline provision.

D.      Motion for New Trial and Request for Evidentiary Hearing

We review for abuse of discretion the denial of a motion for a new trial and the denial of an evidentiary hearing on a motion for a new trial.  United States v. Begnaud, 848 F.2d 111, 113 (8th Cir. 1988).  We have held that a district court may rule on a motion for a new trial based only on affidavits and that an evidentiary

hearing may not be necessary if the judge who ruled on the post-trial motion also presided at trial and, therefore, had a prior opportunity to consider the veracity of the purportedly recanting witness. See, e.g., id. ("The necessity for a hearing is lessened in cases involving challenged testimony where the trial judge has had the opportunity to observe the demeanor and weigh the credibility of the witness at trial."); United States v. Baker, 479 F.3d 574, 579 (8th Cir. 2007) (affirming a denial of an evidentiary hearing and relying, in part, on the fact that motion judge had been trial judge); United States v. Provost, 969 F.2d 617, 619 (8th Cir. 1992) (same). We have not held, however, that the presence of the motion judge at trial should be our sole consideration. Rather, "[t]here may be exceptional circumstances in which an oral hearing should be granted." United States v. Ward, 544 F.2d 975, 976 (8th Cir. 1976) (per curiam).

When reviewing district courts' decisions as to the necessity of evidentiary hearings on motions for new trials, we have relied upon a number of factors. Some of these factors include: the importance of the purportedly recanting witness in obtaining the conviction; the existence of evidence corroborating either the conviction or the recantation; the potential trauma to an abused minor of having to re-testify; the temporal proximity of the trial testimony and the purported recantation; the consistency of the recantation with the witness's comments and behavior before, during, and after trial; and the existence of evidence of outside influence suggesting either coerced testimony or coerced recantation. See, e.g., Baker, 479 F.3d at 579 (finding no abuse of discretion in the denial of an evidentiary hearing where a witness recanted between trial and sentencing, but the witness's trial testimony was relatively unimportant to the defendant's conviction); United States v. Gayles, 1 F.3d 735, 737-38 (8th Cir. 1993) (finding no abuse of discretion in the denial of a hearing in a kidnaping case where the recanting victim-witness married the defendant after the trial, the victim's testimony was not crucial to the conviction, and the victim's recantation was contrary to the testimony of eye-witnesses who had seen the defendant beat the victim-witness and force her into his car); Provost, 969 F.2d at 619

(finding no abuse of discretion where the trial judge had observed a victim-witness who purportedly recanted four years after trial and who had continued to talk of her abuse throughout those four years such that her post-trial statements largely buttressed, rather than detracted from, her trial testimony).

Here, we believe a hearing was necessary. Defendant's conviction for the sexual assault of A.P. rested solely on A.P.'s testimony, which the AUSA elicited largely through the use of leading questions. Further, no physical evidence corroborated A.P.'s trial testimony. Although we sustain this evidence as sufficient to support the conviction, there can be little dispute that this evidence was only minimally sufficient. It is difficult to imagine a case where the testimony of a purportedly recanting witness could have factored more largely into a defendant's underlying conviction.

We note also that A.P.'s purported recantation occurred mere days after trial, and defense counsel as well as the AUSA claim to have heard A.P.'s recantation and the mother's report of the recantation on separate occasions. Further, while A.P.'s trial testimony was consistent with her pre-trial statements to counselors, there is no indication that she maintained her version of the facts following trial. This is not a case like Provost, where years passed between trial and recantation and where the witness maintained her version of the facts following trial.

The government asserts that no hearing was required because this is a clear case of improper influence by Defendant over A.P. and her mother. Cf., United States v. Rouse, 410 F.3d 1005, 1009 (8th Cir. 2005) (finding victim-witnesses' recantations non-credible following a four-day evidentiary hearing based on the fact that medical evidence corroborated the victims' trial testimony and based on the fact that relatives who disbelieved the victims' testimony had custody of the victims between trial and prior to the recantations and exerted influence over the victims during that time). In particular, the government asserts that Defendant held sway over A.P.'s mother during

-14-

the time period following trial, called A.P.'s home over seventy times from the jail, and bribed A.P.'s mother with the purchase of a vehicle. Such behavior, if demonstrated, would be relevant to the veracity of, and motivations for, the purported recantation. The evidence cited by the government, however, was not before the district court when the court ruled on the motion. While an evidentiary hearing may well prove the government correct in its assertion that Defendant exerted improper influence by over A.P. and her mother, we do not believe attorney representations as to this issue are a sufficient grounds for denying a hearing.

Here, the post-trial "record" consisted solely of attorney representations regarding the purported recantation. These representations paint a confusing and inconsistent picture, yet the district court accepted each attorney's representations in ruling on the motion. Given the factors cited above, in particular, the importance of A.P.'s testimony to the conviction and the absence of corroborating evidence, we believe an evidentiary hearing was required.[1]

---

[1]A motion for a new trial should be supported by evidence in the form of an affidavit. Normally, we would not excuse a movant's failure to properly support a motion with evidence in the form of an affidavit or otherwise if that movant later contests the denial of an evidentiary hearing. Here, however, events unfolded rapidly and in an unusual manner that leaves us with the firm conviction that justice demands an evidentiary hearing to ensure that all the relevant facts come before the court. Defendant filed the motion for a new trial and request for a hearing based solely on counsel's representations in the pleadings. The government similarly responded without affidavit based merely on the AUSA's representations. Defendant rebutted these representations with an affidavit, albeit an untimely affidavit attached to the motion to reconsider filed weeks after the court entered judgment on the motion. Defense counsel explains that he had intended to present evidence at a hearing but that the district court ruled quickly and did not inform the parties that no hearing would be granted. In fact, the district court had informed the parties via an earlier letter that it would determine whether a hearing was required. Given this history, it was not unreasonable for counsel to presume that there would be an opportunity to present evidence, at a hearing or otherwise. Given the gravity of the issue before us, the differences in the attorneys' representations of the facts surrounding the recantations,

The judgment of the district court is affirmed in part and reversed in part, and this matter is remanded for further proceedings as discussed herein.

_____

---

and the district court's reliance on both sets of representations, we are unwilling to "penalize" Defendant for counsel's failure.