# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4513-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

E.V.P.,

     Defendant-Appellant.

_____

Submitted May 12, 2021 – Decided June 21, 2021

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-04-0881.

Pashman Stein Walder Hayden, attorneys for appellant (Joseph A. Hayden, Jr., of counsel and on the briefs; Alan Silber and Dillon J. McGuire, on the briefs).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Maura M. Sullivan, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a bench trial, a judge convicted defendant E.V.P.[1] of offenses arising from the sexual abuse of his daughter, Y.P. (Yvette). Defendant appeals from the denial of his motions for a mistrial, judgment of acquittal, and new trial. A central issue in this appeal concerns whether substantial credible evidence in the record exists to sustain the judge's credibility findings and resulting findings of fact. After carefully reviewing the record in light of the applicable legal principles, we affirm.

On April 18, 2018, a Camden County grand jury returned a fourteen-count indictment charging defendant with the following crimes: three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts five, six, and eight); six counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts two, three, nine, ten, eleven, and thirteen); and five counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts one, four, seven, twelve, and fourteen). At the conclusion of defendant's bench trial, the court convicted him of four counts of endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); two counts of aggravated sexual assault, N.J.S.A.

---

[1] We use initials and fictitious names to identify defendant and certain witnesses to protect the identity of the victim pursuant to Rule 1:38-3(c)(9) and N.J.S.A. 2A:82-46.

2C:14-2(a)(1); and three counts of sexual assault, N.J.S.A. 2C:14-2(b). The court acquitted defendant of the remaining counts.

The victim, Yvette, was the daughter of defendant and E.M. (Erica). Born in 2007, Yvette lived in Camden with Erica and her two sisters, R.R. (Rachel) and J.R. (Joan). Yvette testified defendant sexually abused her on four occasions in August 2016, July 2017, December 2017, and January 2018, when she was between eight and ten years old.

At trial, Dr. Maria McColgan, a Child Abuse Pediatric Fellowship Director and Associate Professor at the Child Abuse Research Education and Research Institute (CARES), testified as an expert in the field of pediatric child abuse. The State offered Dr. McColgan's report detailing Yvette's account of the January 2018 incident. Defendant objected to the admission on the basis that the report included embedded hearsay, but the judge nonetheless admitted it as a business record, noting he would deal with any statements elicited for the purpose of a medical diagnosis if defendant raised an objection. The report included Yvette's assertions that "there were multiple episodes of vaginal penetration" and that defendant's conduct was "disgusting." While testifying, Dr. McColgan reviewed the report several times to refresh her recollection. Dr.

McColgan's physical examination of Yvette was unremarkable, but not inconsistent with episodes of vaginal penetration that may heal quickly.

Dr. Sandra J. Nairn, the division head of the Pediatric Emergency Department at Cooper University Hospital, also testified as the State's witness. She reviewed Yvette's charts before examining her and identified a copy of Yvette's hospital visit record. The judge admitted the document subject to defendant's right to object to any specific hearsay issues. Defense counsel raised no objections.

Dr. Nairn testified that she treated Yvette on January 25, 2018, when she "came in with [a] complaint that [Erica] came home from work and found her in the basement with her father on top of her with his pants down." Yvette said defendant would rub his penis on her face, but denied penetration or oral sex, and asserted that defendant told her not to tell anyone, or one of them could die. During cross-examination, Dr. Nairn specified that Yvette's physical examination did not indicate any signs of trauma, but on redirect, clarified that a "normal exam does not exclude any inappropriate contact or abuse."

On the sixth day of trial, defense counsel moved for a mistrial, contending the State committed a serious, albeit unintentional, discovery violation. Counsel explained a CARES physician's report indicated Erica "was concerned because

4

two weeks prior to the incident she had seen a text message that [Yvette] had sent to her cousin which alerted her or caused concern that there may be sexual activity going on or that [Yvette] . . . liked men."

Defense counsel emailed the lead prosecutor in May 2018, requesting a copy of the text message. Defense counsel sent two follow-up requests, receiving no response. In February 2019, at a meeting in the prosecutor's office, Erica mentioned she had spoken to defendant about the text messages on the date of the incident.

Defense counsel again emailed the lead prosecutor, who then responded:

> Last summer two of our detectives asked [Erica] about that message about liking men [as] described in the CARES report. [Erica's] only response was that when she asked [Yvette] what the message was about, [Yvette] said it was about seeing a little cousin's private parts while peeing. At that point, we thought the message had nothing to with the case. For that reason, I don't believe they took any notes[,] but I just asked them and I'm waiting on a response.

After hearing argument, the judge found that "the information obtained by investigators in the summer [of] 2018 about the message from [Yvette] to her cousin . . . referred to in the February 28 CARES report[,] should have been produced" in discovery by the State. However, the only detriment to the defense was a loss of a few months for investigation. Moreover, information gained

from following up "would have been additional information, not the exclusive information that the defense could use on that front." The judge found that the delayed disclosure did not rise to the level of a manifest injustice justifying a mistrial and therefore denied the motion.

On June 12, 2019, after the trial ended, the judge issued a comprehensive oral decision including the following factual findings pertinent to the issues raised on appeal. Defendant and Erica, who never lived together, had a long-term romantic relationship while defendant was married to D.P. (Denise). The relationship ended two months before the January 25, 2018 incident.

On that date, because she could not pick up Yvette from early dismissal, Erica asked defendant to do so. Defendant took the child home. As the two sat watching television on a basement couch, defendant pulled down Yvette's pants and underwear. Defendant exposed himself and may have touched Yvette with his penis. Yvette heard the front door open and used the remote to mute the T.V., hoping to prompt her mother to investigate the silence. Erica, intending to surprise the two, descended the basement stairs and saw defendant making sexual movements near Yvette's bare legs and bottom. After Erica said defendant's nickname, defendant put his penis back in his pants and shouted that [Yvette] was "fre[s]ca" and that he had not done anything.

A-4513-19

In the ensuing commotion, defendant indicated Yvette was to blame, and had "planted this to get [him] in trouble." Later that day, when Erica confronted defendant at his home, defendant continued insisting Yvette was responsible and "said that all he wanted was for no one to know about this. After [Erica] returned to her home and a trusted family friend came to the house, [Rachel] called 911 at approximately 2:15 in the afternoon."

We need not recount the particulars of the three remaining incidents. It suffices to note that, for the reasons discussed below, the trial court found Yvette testified credibly as to the specifics of each one, and in doing so, detailed at length defendant's sexual assaults. As a result, the court convicted defendant.

The judge's factual findings derived, in large part, from his credibility assessments concerning the three key witnesses: Yvette, Erica, and defendant. He found Yvette's accounts of each episode to be "credible and compelling." The judge gave particular weight to "the manner in which [Yvette] described the history of defendant's conduct towards her[,] including the events of January 25, 2018, during her statement given to Detective Courtney . . ." He found that description "unscripted, spontaneous and genuine." For example, in several instances, Yvette "physically demonstrated the events she was describing[,]" such as "us[ing] her hands to mimic . . . defendant's actions" when wiping his

7

ejaculate off with his hand. Nothing he heard during the trial caused the judge to conclude Yvette's "demonstrations were created to illustrate a fabricated account."

In addition, Yvette told the detective that defendant "[did] disgusting things to her" and "had been unzipp[ing] his pants" but "said that she didn't have the nerve to tell her mom because the defendant said that one of [them] would die." Yvette said she told her older cousin but instructed her not to tell anyone. The judge did not draw an adverse inference from this because of the cousin's youth and her mother's refusal to permit the State to take her statement.

The judge rejected defendant's contention that the events were mere products of Yvette's imagination because she was unemotional, her affect was somewhat flat, she giggled nervously at times, and did not cry or exhibit sadness indicating painful memories. The judge observed that Dr. McColgan testified credibly that "there is no standard demeanor for a child who is reporting sexual abuse."

The judge found other compelling evidence of Yvette's credibility in the "asides that she provided during the statement." It would be unreasonable to believe that a child would make such comments "to embellish a fabricated account." In addition, if that child was "trying to set up a person to be falsely

accused, one would not expect the child to readily admit she wanted the person caught in the act."

The judge opined that the level of distinctive detail Yvette provided about each incident and her reactions, including details that made the defendant seem "somewhat less culpable," coupled with "the high degree of consistency" of her statements to the medical providers at Cooper Hospital and CARES, her recorded statement to police, and her trial testimony, "strongly supported" her credibility. He did not consider Yvette to have been "coached" or "rehearsed."

The judge found the absence of DNA evidence did not undermine Yvette's credibility regarding the January 25, 2018 incident. He also found any discrepancy between Yvette's statement and the report of the Sex Assault Nurse Examiner to be inconsequential.

The judge found Erica's testimony regarding the January 25, 2018 incident and defendant's statements during and after the incident to be "compelling" and "credible in all material respects." Erica answered questions directly during both direct and cross-examination, and "did not embellish her account to make it sound even worse. She readily admitted that the defendant was fully clothed and that she never saw his penis exposed that day." The judge further noted that Erica became very emotional when recounting what she saw defendant doing to

9

her daughter. He considered her emotional demeanor to be genuine, not feigned. Moreover, Yvette and Rachel's testimony corroborated Erica's account.

Defendant's own testimony "confirm[ed] that [Erica] reacted immediately and loudly to what she saw." The judge considered it significant that defendant immediately attempted to blame Yvette while later admitting to Erica and his wife, Denise, that "the only thing [he] want[ed] is for this not to be known."

As to defendant's claim that Erica "was motivated by romantic or financial bias or a desire for revenge," the judge commented that all four defense witnesses had "an obvious . . . interest in the outcome of this case" as two were his children, and two were cousins. The judge rejected their testimony that Erica gave them an account of the incident that was directly contrary to her statement to police and her testimony in court. He determined Erica's emotional statement at the end of cross-examination denouncing the allegation that she was motivated by money to be "credible and heartfelt[,]" in contrast to defendant's uncorroborated testimony that Erica "gave him an ultimatum to either leave his wife and move in with her or pay off her mortgage." As to a chance encounter between Erica and defendant's wife Denise at a local store after defendant's arrest, the judge viewed Erica's reaction to be neither an admission nor an acknowledgement that she was pursuing false accusations against the defendant.

 A-4513-19

Although defendant's character witnesses testified credibly, the judge gave their testimony minimal weight. Three of the character witnesses' interactions with defendant took place so long ago that their opinions had "little or no probative value," and the remainder did not observe defendant's interactions with Yvette.

Following the verdict, defendant moved for a judgment of acquittal under Rule 3:18-2, or in the alternative, for a new trial under Rule 3:20-1. The judge issued a December 5, 2019 order and thirteen-page decision denying the motion.[2]

The judge merged count seven, second-degree child endangering, into count five, first-degree aggravated sexual assault; count four, second-degree child endangering, into count three, second-degree sexual assault; count twelve, second-degree child endangering, into count nine, second-degree sexual assault; and count fourteen, second-degree child endangering, into count thirteen, second-degree sexual assault. He sentenced defendant to concurrent terms of

---

[2] Although defendant's case information statement includes the order denying his motion for a judgment of acquittal or new trial, he has not briefed that issue. "An issue not briefed on appeal is deemed waived." Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 318-19 (App. Div. 2017) (quoting Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011)).

imprisonment as follows:  on each first-degree aggravated sexual assault, counts five and six, thirty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; on each second-degree sexual assault, counts three, nine, eleven, and thirteen, six years subject to NERA; and a flat term of six years on count one, second-degree child endangering.  The judge also imposed parole supervision for life, N.J.S.A. 2C:43-6.4, and the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23.  This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE STATE'S FAILURE TO OBTAIN, PRESERVE, AND TURN OVER POTENTIALLY EXCULPATORY EVIDENCE RESULTED IN A MANIFEST FAILURE OF JUSTICE.

A. LAW ON THE STATE'S DISCOVERY OBLIGATIONS.

B. THE STATE ACTED INTENTIONALLY IN FAILING TO PRESERVE POTENTIAL EXCULPATORY EVIDENCE AND DISCLOSE THE CONTENTS OF [YVETTE'S] TABLET TO THE DEFENSE.

C. THE STATE'S FAILURE TO PRESERVE POTENTIALLY EXCULPATORY EVIDENCE AND DISCLOSE THE CONTENTS OF [YVETTE'S] TABLET TO THE DEFENSE RESULTED IN "MANIFEST PREJUDICE AND HARM" AND

12

VIOLATED DEFENDANT'S DUE PROCESS RIGHTS.

D. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL.

POINT II

THE TRIAL COURT ERRED BY BASING ITS FACTUAL FINDINGS ON INADMISSIBLE HEARSAY AND USING HEARSAY TO CORROBORATE [YVETTE'S] TESTIMONY AND BOLSTER HER CREDIBILITY.

A. LAW ON IMPROPER ADMISSION AND CONSIDERATION OF HEARSAY EVIDENCE.

    1. Dr. McColgan's Testimony and Report.

    2. Dr. Sandra Nairn's Testimony and Report.

    3. Trial Court's Erroneous Credibility Findings.

POINT III

IMPROPER USE OF PRIOR STATEMENT TO REFRESH RECOLLECTION.  (Not Raised Below).

POINT IV

THE CREDIBILITY FINDINGS IN JUDGE MCBRIDE'S VERDICT ARE CLEARLY MISTAKEN BECAUSE THEY ARE WHOLLY UNSUPPORTED BY THE EVIDENCE ADDUCED IN THE RECORD.

    1. The Credibility of [Yvette].

A-4513-19

2. The Credibility of [Erica] Juxtaposed to [Defendant's] Credibility.

We first address defendant's argument that the State's failure to preserve potentially exculpatory evidence and disclose the contents of a message on Yvette's tablet resulted in a manifest injustice and prejudice that denied defendant's right to due process. Defendant contends the trial court should have granted a mistrial or, at the very least, "delayed the trial and ordered the State to retrieve [Yvette's] tablet and conduct a forensic extraction to be turned over to the defense." We are unpersuaded.

Rule 3:13-3(f) imposes "a continuing duty on the State to provide discovery" of relevant information. State v. Smith, 224 N.J. 36, 48 (2016). "When a party fails to comply with its obligations, the discovery rule expressly states that the court may 'grant a continuance or delay during trial' or 'enter such other order as it deems appropriate.'" Ibid. (quoting R. 3:13-3(f)). The court may order a mistrial if the "defendant can demonstrate manifest injustice due to the State's discovery violation." State v. Harris, 181 N.J. 391, 519 (2004). Denial of a mistrial is error "where 'a different trial strategy would have been employed' but for the discovery violation." Ibid. (quoting State v. Blake, 234 N.J. Super. 166, 175 (App. Div. 1989)).

"Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" Smith, 224 N.J. at 47 (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). We will not disturb the denial of a mistrial "unless there is a clear showing of mistaken use of discretion by the trial court," Greenberg v. Stanley, 30 N.J. 485, 503 (1959) (citations omitted), or a manifest injustice would result, State v. LaBrutto, 114 N.J. 187, 207 (1989).

We discern no abuse of discretion. Defense counsel questioned multiple witnesses about Yvette's tablet and the text message to her cousin. This only showed Yvette had knowledge of sexual matters from sources other than sexual abuse, which went to the defense's theory that Yvette was fabricating the abuse. As the Judge later explained in his decision denying defendant's motion for judgment of acquittal or a new trial, "the court noted that the message most likely involved a joking reference to [Yvette] having seen her young male cousin's penis." Whether the message was sexually oriented had "little if any probative value." "[Yvette's] prior knowledge of sexual matters was never in dispute. She testified that by the time she was in fifth grade (a year before this case arose) she had heard from others in school about sex and 'knew what sex was.'" Further, defendant has not demonstrated that an earlier disclosure of the message would have changed defense counsel's legal strategy. See Harris, 181

N.J. at 519.  The State's failure to timely disclose the text message did not result in a manifest injustice or denial of due process.  The denial of defendant's motion for a mistrial was not error.

We next address defendant's argument that the court erred by relying on hearsay testimony by Dr. McColgan and Dr. Nairn and embedded hearsay in their reports and using that hearsay to corroborate Yvette's testimony and bolster her credibility.  We are unpersuaded.

Hearsay is an out-of-court statement used to prove the truth of the matter asserted.  N.J.R.E. 801(c).  Hearsay is generally inadmissible unless a recognized exception applies.  N.J.R.E. 802.  One such exception is a statement "made in good faith for purposes of, and . . . reasonably pertinent to, medical diagnosis or treatment" that "describes medical history; part or present symptoms or sensations; their inception; or their general cause."  N.J.R.E. 803(c)(4).  Another exception is a statement contained in records of regularly conducted activity under N.J.R.E. 803(c)(6), which provides:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

A-4513-19

This exception does not apply if the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

Generally, a trial judge's "evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Harris, 209 N.J. 431, 439 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Although defense counsel initially raised concern about possible embedded hearsay in the reports, he did not object to any specific statements. We therefore review for plain error. State v. Gore, 205 N.J. 363, 382-83 (2011). Under that standard, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2.

The judge found both Dr. McColgan's and Dr. Nairn's reports admissible under N.J.R.E. 803(c)(6). Defendant argues that both reports contain hearsay statements by Yvette to the doctors. More specifically, defendant argues that Yvette's statements to Dr. McColgan regarding "sticky stuff" coming out of defendant's penis and her statement to Dr. Nairn regarding whether defendant penetrated her and whether her clothing was off were not for the purpose of medical diagnosis. We disagree.

A-4513-19

Yvette's statements that are reflected in those reports were made for the purpose of describing her "medical history," including its "inception or general character of the cause or external source thereof" and were "reasonably pertinent to diagnosis or treatment." N.J.R.E. 803(c)(4). For instance, Dr. McColgan testified she asked Yvette about instances of sexual abuse in order to "come up with a treatment plan." Likewise, Dr. Nairn, who testified as Yvette's attending physician, indicated she obtained Yvette's history to appropriately assess her and make treatment orders. The emergency department records included her medical charts, lab results, and consent to treatment. The statements contained in those records clearly related to identifying any physical or mental trauma. Considering the judge's credibility findings, which were supported by substantial, credible evidence in the record, see infra at pages 21-22, we conclude that Yvette's statements were "made in good faith for purposes of medical diagnosis or treatment." N.J.R.E. 803(c)(4). Accordingly, they were admissible under N.J.R.E. 803(c)(4).

In addition, the statements were recorded in business records that were admissible under N.J.R.E. 803(c)(6) as a regularly conducted activity. Their authenticity was not challenged. "Subject to the limitations of Rule 808, the business records exception routinely permits the admission of medical records."

18

<u>Konop v. Rosen</u>, 425 N.J. Super. 391, 403 (App. Div. 2012). We discern no plain error. Moreover, defendant did not brief the inadmissibility of the statements under N.J.R.E. 803(c)(6). We deem that issue waived. <u>See</u> <u>Woodlands Cmty. Ass'n</u>, 450 N.J. Super. at 318-19 (quoting <u>Sklodowsky</u>, 417 N.J. Super. at 657).

For the first time on appeal, defendant argues that the State improperly used Yvette's statement to police to refresh her recollection. Since defendant did not object to the State's use of refreshed recollection, we review for plain error. <u>R.</u> 2:10-2.

In response to questioning, Yvette indicated it was hard to remember certain details. After reviewing a particular page of the statement, Yvette stated her "memory is coming back." A similar use of her statement to police occurred several other times during her testimony.

"Once a proper foundation has been laid, a witness may examine any document to refresh [her] memory." <u>State v. Carter</u>, 91 N.J. 86, 122 (1982); <u>see</u> <u>also</u> N.J.R.E. 612. If, after looking at the document, the witness's recollection is refreshed, "he or she may then testify as to that refreshed recollection." <u>State v. Williams</u>, 226 N.J. Super. 94, 103 (App. Div. 1988) (citing <u>Carter</u>, 91 N.J. at 122-23). However, the trial court "may decline to permit its use where the

19

danger of undue suggestion outweighs the probable value of the evidence." Carter, 91 N.J. at 123.

Defendant complains that the State improperly refreshed Yvette's recollection nine times with her statement, which he claims had the same effect as leading questioning. The State contends it is understandable that an eleven-year-old girl would forget details of events that occurred when she was nine and ten. It argues defendant suffered no prejudice because Yvette's statement had been admitted in evidence under N.J.R.E. 803(c)(27).

Here, unlike in State v. Caraballo, the State was not using Yvette's statement to insert "into the record the contents of an otherwise inadmissible writing under the guise of refreshing recollection." 330 N.J. Super. 545, 557 (App. Div. 2000). Defendant's right of confrontation was not abridged. Yvette indicated she was having difficulty remembering certain details. That is hardly surprising given Yvette's tender age, the threat that defendant made to her,[3] and the stress of testifying in court. See McCormick On Evidence § 9 (Mosteller ed., 8th ed. 2020) (noting that "testifying at trial can be an intimidating experience"); Cf. United States v. Grassrope, 342 F.3d 866, 869 (8th Cir. 2003)

---

[3] Yvette told Detective Courtney that during the sexual abuse incidents, defendant told her she could not tell her mother because "one of us could die."

("We have repeatedly upheld the use of leading questions to develop the testimony of sexual assault victims, particularly children."). Yvette's statement clearly refreshed her recollection. Defendant has not demonstrated that undue suggestion occurred. We find no plain error.

Lastly, we address defendant's argument that the judge's credibility findings were unsupported by the evidence and clearly mistaken. We find this argument lacks sufficient merit to warrant extended discussion. R. 2:11-3(e)(2).

Our scope of review of the factual findings of a judge sitting without a jury is limited. State v. Locurto, 157 N.J. 463, 470-71 (1999) (citing State v. Johnson, 42 N.J. 146, 161-62 (1964)). "[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). This principle applies with even greater force "to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, 42 N.J. at 161. "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so

manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ." Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 484 (1974).

Applying these standards, we discern no basis to disturb the Judge Edward J. McBride Jr.'s findings. He fully explained his credibility findings, frequently using examples of the specific testimony he found most significant. Based on our careful review of the record, we are convinced that Judge McBride's findings "could reasonably have been reached on sufficient credible evidence present in the record." Johnson, 42 N.J. at 162. Accordingly, our "task is complete." Ibid.

To the extent we have not specifically addressed defendant's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4513-19